**UNITED STATES of America,**

v.

**Kenneth RANDOLPH.**

Crim.A. No. 02–114.

United States District Court, E.D. Pennsylvania.

May 28, 2002.

George Shotzbarger, U.S. Attorney's Office, Philadelphia, PA, for U.S.

## MEMORANDUM

DALZELL, District Judge.

Surprising as it may seem, a commonplace law enforcement situation presents a legal issue which, as far as we can tell, presents a question of first impression. Specifically, does a fugitive from a halfway house have any Fourth Amendment expectation of privacy that would require a warrant before his room could be searched?

As will be seen, our resolution of this question is greatly assisted by the Supreme Court's decision last December in *United States v. Knights*, 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001). Before turning to this legal issue, however, we shall set forth the underlying facts as we have found them after considering the evidence adduced at the suppression hearing on May 23.

### Factual Background

It is undisputed that on March 27, 1995 defendant Kenneth Randolph was sentenced to five to ten years' imprisonment for armed robbery, burglary and criminal conspiracy in the Court of Common Pleas of Philadelphia County. As he was taken into custody for these offenses on March 25, 1994, the minimum term of his sentence expired on March 25, 1999.

As a result of the action of the Pennsylvania Board of Probation and Parole, Randolph was in 1999 transferred to custody at GPCCC/Kintock at 1347 Wood Street in Philadelphia. Among his May 27, 1999 conditions of parole to this facility was the requirement that he reside at Kintock for nine months. Notwithstanding this specific condition, it is also undisputed that on July 17, 1999 he without permission left the Kintock Group halfway house and never returned.

Upon learning that Randolph had without authorization left the Kintock facility, his parole agent, Ms. Robin Taylor, initiated the paperwork that ultimately resulted in the Parole Board's formal declaration that Randolph was delinquent. Agent Taylor entered Randolph's delinquency on the N.C.I.C. system as well as completed a "wanted" poster, soliciting Randolph's arrest from law enforcement agencies in Pennsylvania and elsewhere.

As a result of information supplied to Agent Taylor from a confidential informant, on April 25, 2000 Agent Taylor and seven other parole officers went to the home of Randolph's sister, Felicia, at 1942 South 57th Street in Philadelphia. Agent Taylor arrived at the house armed with an order of the Parole Board to detain Randolph for an initial period of forty-eight

hours, an order later that day made without time limit by the Parole Board's warrant to commit and detain.

We credit Agent Taylor's testimony that she knocked on the door of Felicity Randolph's house at about 7:30 a.m. on April 25, 2000. Ms. Randolph's daughter, Melissa, answered the door, and called her mother downstairs. Ms. Randolph let the three officers in, and admitted to them that "Kenny is upstairs." Given the presence of at least one small child, Ms. Randolph expressed her concern that her brother's apprehension be done without any use of firearms.[1]

Agent Taylor and two of her colleagues went up the stairs and found Randolph in the hall, wearing only his boxer shorts. Randolph welcomed the officers by holding out his arms in such a way as to invite handcuffing, which Agent Taylor promptly obliged. Recognizing that Randolph had been convicted of robbery with the use of a firearm, Agent Taylor then made a protective sweep of the bedroom where Randolph had been sleeping with his girlfriend.

Upon entering the then-unoccupied bedroom—which Agent Taylor knew Randolph would have to re-enter in order to get dressed—she saw a cell phone and pager in plain view. Randolph's possession of these items was in violation of specific conditions of his parole, which provided that he was "not to possess, on your person, property, or residence, any electronic paging devices such as pagers, cell phones, digital phones, etc."[2] When Agent Taylor neared the cell phone, Randolph blurted out, "Oh, that cell phone doesn't even work." Agent Taylor then looked under the bed which occupied much of the room, and found a 9mm semiautomatic Llama firearm, which was loaded. Further search of the room uncovered body armor (in violation of Count # 2 of Randolph's special conditions of parole) as well as drug paraphernalia, such as a scale and vials.

After the arrest, Randolph was subjected to charges in the state system, as well as to violation hearings before the Parole Board. On September 18, 2000, after a hearing, the Parole Board recommitted Randolph for eighteen months of additional custody. The Commonwealth of Pennsylvania having made no progress in prosecuting Randolph for his violation of the Uniform Firearms Act, this case was federalized and Randolph was indicted earlier this year for being a felon in possession of a firearm that had travelled in interstate commerce, in violation of 18 U.S.C. § 922(g)(1).

In advance of the trial that was to have started today, Randolph on April 24, 2002 filed a motion to suppress the physical evidence obtained on April 25, 2000 and

---

1. The presence of the child alone made the agents' decision to go upstairs reasonable. They well knew that Randolph had been convicted of armed robbery and had reason to believe that while a fugitive Randolph had been involved in some shooting(s) in Harrisburg. To require, as Randolph contends, that the agents wait outside would have been irresponsible given the obvious hostage possibilities occasioned by Melissa's presence.

It also bears noting here that we recognize that Ms. Randolph's account of what happened that morning differs from Agent Taylor's in important respects, but given her many inconsistencies with her Grand Jury testimony, as well as her evident desire to protect her younger brother, we accord little credibility to what she said before us. By contrast, Agent Taylor struck us as a forthright reporter of what happened. Agent Taylor's colleague in the arrest, Agent Joseph Gillespie, confirmed Agent Taylor's testimony in all material respects.

2. Govt. Ex. G–M–3.

to suppress certain statements he made that day.[3]

*Legal Analysis*

As Randolph has invoked the Fourth Amendment, we must consider a threshold question before deciding whether this constitutional right was violated. That is to say, we must first consider whether Randolph enjoyed any Fourth Amendment rights before we analyze whether they were not honored.

In essence, Randolph claims that the April 25, 2000 search was unlawful because it was not incident to a lawful arrest. He claims that the parole agents did not have reasonable suspicion to arrest him at the place they did since it was predicated on the report of an unreliable, and undisclosed, confidential informant. We reject this claim for a number of reasons.

As mentioned at the outset of this Memorandum, we have found no case, and none has been brought to our attention, dealing with what, if any, Fourth Amendment protections convicted fugitives like Randolph may have. We know, however, from the Supreme Court's recent decision in *Knights, supra,* that probationers have fewer rights than citizens who have never been sentenced for any crime. We also know from *Hudson v. Palmer,* 468 U.S.

517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) that defendants who are in full custody have *no* Fourth Amendment protection against unreasonable searches within the confines of their prison cells. *See id.* at 525–26, 104 S.Ct. 3194 ("we hold that society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell and that, accordingly, the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell.").

At a minimum, it is inconceivable that a convicted fugitive could be in any better Fourth Amendment position than a probationer. As Chief Justice Rehnquist noted about such defendants in *Knights:*

Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests make such a standard reasonable. *See, e.g., Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). Those interests warrant a lesser than probable-cause standard here. When an officer has reasonable suspicion that a probationer

---

**3.** At the oral argument today, Randolph withdrew his request to suppress statements, as none of any consequence was made on April 25, 2000. Parole agents in any event may without *Miranda* warnings question parolees. Indeed, in a case dealing with the Fifth Amendment rights of probationers (and not fugitives), *Minnesota v. Murphy,* 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984), the Supreme Court was at pains to distinguish between probation-related questions by a probation officer from interrogation having to do with separate offenses:

Just as there is no right to a jury trial before probation may be revoked, neither is the privilege against compelled self-incrimination

available to a probationer. It follows that whether or not the answer to a question about a residential requirement is compelled by the threat of revocation, there can be no valid claim of the privilege on the ground that the information sought can be used in revocation proceedings

Our cases indicate, moreover, that a State may validly insist on answers to even incriminating questions and hence sensibly administer its probation system, as long as it recognizes that the required answers may not be used in a criminal proceedings and thus eliminates the threat of incrimination.

*Id.* at 435, n. 7, 104 S.Ct. 1136.

subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable.

*Knights,* 122 S.Ct. at 592–93.

The Chief Justice predicated treating probationers differently because " 'the very assumption of the institution of probation' is that the probationer 'is more likely than the ordinary citizen to violate the law.' " *Id.* at 592, quoting *Griffin v. Wisconsin,* 483 U.S. 868, 880, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987). The Chief Justice then cited Department of Justice studies which confirmed the common sense expectation that "[t]he recidivism rate of probationers is significantly higher than the general crime rate." *Id.* Probationers also have powerful incentives "to conceal their criminal activities and quickly dispose of incriminating evidence" because of their awareness of the swift consequence of detected probation violations "in proceedings in which the trial rights of a jury and proof beyond a reasonable doubt, among other things, do not apply", *id.* In view of these realities, the community may reasonably tip the Fourth Amendment balance differently than it does for those who enjoy the presumption of innocence:

> The State has a dual concern with a probationer. On the one hand is the hope that he will successfully complete probation and be integrated back in to the community. On the other is the concern, quite justified, that he will be more likely to engage in criminal conduct than an ordinary member of the

community. The view of the court of Appeals in this case would require the State to shut its eyes to the latter concern and concentrate only on the former. But we hold that the Fourth Amendment does not put the State to such a choice. Its interest in apprehending violators of the criminal law, thereby protecting potential victims of criminal enterprise, may therefore justifiably focus on probationers in a way that it does not on the ordinary citizen.

*Id.* at 592.

■ The question here devolves into whether, by unlawfully becoming a fugitive on July 17, 1999, Randolph won himself more rights than he would have had if he had remained in custody at the Kintock Group. Phrased this way, it does seem more than a little odd to suggest that the law should, in effect, give inmates constitutional rewards for fleeing their fetters. Thus, it would seem that to avoid that perverse result, a sensible rule would only require that all law enforcement officers need to do is to identify the fugitive and then they are free to search whatever area he has occupied during his fugitive status. Under such an approach, once Felicia Randolph admitted that her brother was upstairs, Agent Taylor and her colleagues were free to search her brother's bedroom to their hearts' content recognizing, of course, that they could not do the same as to the rest of the sister's house.[4] This would, in our view, constitute the better calculus of the balancing that we must make in our reasonableness inquiry under the Fourth Amendment.[5]

---

**4.** It bears noting in this regard that Ms. Randolph (grudgingly) admitted that her Grand Jury testimony was correct that the parole agents treated her and the others in the house "with respect". N.T. of Jan. 22, 2002 at 31.

**5.** As the Supreme Court held in *Knights* in this regard, "The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is

■ If, on the other hand, we were to pretend that a convicted fugitive like Randolph occupies the same legal status as a probationer—a peculiar pretense in view of the reality that all of *Knights's* justifications for lesser protections for probationers apply *a fortiori* to inmate-fugitives—then all the law enforcement officers would need is a "reasonable suspicion" that the fugitive possessed contraband when he was found. In Randolph's case, once Felicia Randolph conceded her brother's presence, and allowed the officers entry into her house, they were then and there entitled to arrest the man they found at the top of the stairs *and* to continue a search incident to that arrest.[6] The fact that Randolph was immediately handcuffed is of no significance in this regard, as our Court of Appeals quite some time ago made clear in *Government of the Virgin Islands v. Rasool,* 657 F.2d 582 (3d Cir. 1981). Under the circumstances here— where the officers were dealing with a

fugitive who had been convicted of armed robbery—the officers had ample justification to conduct what Agent Taylor described as a "protective sweep" of Randolph's bedroom. In the course of that sweep, once Agent Taylor saw the forbidden cell phone and pager, she had double justification for looking for other contraband and, most seriously, weapons. She found more contraband when she and her colleagues discovered the body armor, and the gun was found in a place where Randolph could well have reached it if he was unhandcuffed as he dressed.

In sum, looking at the "totality of the circumstances" as the Supreme Court directed in *Knights* and *Ohio v. Robinette,* 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996), there was nothing unreasonable that these law enforcement officers did under the Fourth Amendment's assumed authority, and Randolph's motion to suppress is without merit if we accord him *Knights's* status.[7] If, as we believe, he

needed for the promotion of legitimate governmental interests.' " *Id.* at 591, 122 S.Ct. 587, quoting *Wyoming v. Houghton,* 526 U.S. 295, 300, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999).

**6.** Much colloquy at the hearing centered upon whether Agent Taylor in fact had an "arrest warrant". Given the fact that Randolph was a fugitive, this dispute is of no legal moment given the broad statutory powers Pennsylvania parole officers like Agent Taylor and her colleagues have:

Parole officers appointed by the board are hereby declared to be peace officers and are hereby given police power and authority throughout the Commonwealth to arrest without warrant, writ, rule or process any parolee or probationer under the supervision of the board for failing to report as required by the terms of his probation or parole, or for any other violation thereof. 61 Pa. Cons.Stat. Ann. § 331.27.

It also bears noting that the next provision in *Purdons,* § 331.27a, at subsection (b) specifically authorizes Pennsylvania parole

agents "to search the person and property of State offenders", subject of course to constitutional limits. At subsection (d)(1), the statute also provides:

A personal search of an offender may be conducted by any agent:
(i) if there is a reasonable suspicion to believe that the offender possesses contraband or other evidence of violations of the conditions of supervision.

**7.** Randolph in post-argument briefing places great stress on a pre-*Knights* case, *United States v. Patino,* 830 F.2d 1413 (7th Cir.1987). While *Patino* involved a fugitive, it had to do with a search of a third party's home where the fugitive was not, as here, residing, an important distinction under *Payton v. New York,* 445 U.S. 573, 603, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)("for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within."). Armed with reasonable suspicion and a forty-eight hour detention order, Agent Taylor went to the house

should be regarded in the status *Hudson v. Palmer* described, his motion is frivolous.[8]

In any event, we will deny Randolph's motion to suppress.

were Randolph was living. Upon learning that Randolph was in fact there, it was reasonable under the Fourth Amendment to search his dwelling area for contraband and weapons. *See also United States v. Wickizer,* 633 F.2d 900 (6th Cir.1980), *cert. denied,* 450 U.S. 935, 101 S.Ct. 1401, 67 L.Ed.2d 370 (1981).

**8.** Of course, if we are right that captured fugitives like Randolph have no Fourth Amendment protections, states may nevertheless give them more than the federal constitutional minima. This may well be what the Commonwealth of Pennsylvania has done here in § 331.27(a)(d)(1), quoted *supra* in note 6.

It is a very nice question to what extent the Government is hobbled by the more generous state standard where, as here, it elects to federalize a state inmate's wrongdoing. As we have held that, once they found Randolph, they had reasonable suspicion to search his space, we (mercifully) need not resolve this interesting question.