**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
February 26, 2009

No. 08-50114

Charles R. Fulbruge III
Clerk

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

DAN LARRY WARD

Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas

Before HIGGINBOTHAM, ELROD, and HAYNES, Circuit Judges.

PATRICK E. HIGGINBOTHAM:

Shortly after he received a 10-year federal sentence on a felon in possession charge, state authorities mistakenly released federal prisoner Dan Ward, who exploited the situation by absconding. This case presents the question of whether Ward enjoyed a Fourth Amendment right to privacy that was violated by a warrantless search of his motel room.

I

Federal marshals learned that Ward had contacted his mother after his escape and that his car, a maroon Buick, was parked in her driveway. Two deputies were dispatched to Odessa, Texas where Ward's mother lived, but found Ward's car gone. During their search of area motels, with an eye for the Buick,

the marshals located the car in a Days Inn parking lot. The Days Inn clerk advised that Ward was not a registered guest. The marshals then staked-out the car.

After a few hours, Ward appeared on the scene, walking briskly towards the car. The marshals moved in. As Ward got in his car, they pulled in front of him, flashing the unmarked car's red police strobe light and honking the car's horn. Ward turned his wheel and took off around the marshals who followed in pursuit. Ward drove towards a nearby residential area, blowing through a stop sign and turning the wrong way down a one-way street. Concerned they might cause an accident, the marshals abandoned the chase, but not before seeing Ward turn into an alley that led back to the strip of motels.

Thinking that Ward may have been trying to retrieve something from a motel room and not wanting the trail to go cold, the marshals checked other nearby motels. At the first motel—the Parkway Inn directly next door to the Days Inn where they first spotted Ward's car—the manager confirmed that Ward was a guest, registered under his own name. After obtaining the key, the marshals knocked and then cautiously entered room 133, with guns drawn. They cleared the room, determining that Ward was not present, and then searched for clues of Ward's whereabouts. The first item they checked was a bag, described as looking like a camera bag. Unzipping the bag the marshals found a soft gun case, with a loaded 9mm Beretta semi-automatic handgun, loose ammunition, an address book, and a pharmacy card.

Ward was soon after apprehended in the nearby town of Midland, and on the basis of the gun and ammunition found in his motel room, indicted on counts of felon in possession of a firearm and fugitive in possession of a firearm. Ward filed a motion to suppress the evidence found in his motel room, which the district court denied. Ward then pled guilty, retaining the right to appeal the

denial of his motion to suppress, which he now does. We review the legal conclusions of the district court de novo.[1]

## II

The question before us is whether Ward, as an escapee,[2] had a right of privacy in his motel room entitling him to the protection of the Fourth Amendment against unreasonable searches. Justice Harlan in his oft-quoted concurrence in *Katz v. U.S.*[3] gives the proper framework for answering the legal question: whether a person may invoke the Fourth Amendment to suppress evidence gained through government intrusion not authorized by a warrant turns on whether that person has a "constitutionally protected reasonable expectation of privacy."[4] Such an expectation requires "first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'"[5] It is

---

[1] *U.S. v. Ceniceros*, 204 F.3d 581, 584 (5th Cir. 2000).

[2] Ward asserts that because he was mistakenly released he is not technically an escapee. Ward is incorrect. In the narrower, but related, context of the federal escape statute, the Supreme Court noted that "we think it clear beyond peradventure that escape from federal custody as defined in [the federal escape statute] is a continuing offense and that an escapee can be held liable for failure to return to custody as well as for his initial departure." *U.S. v. Bailey*, 444 U.S. 394, 413 (1980). Interpreting the same statute, the Eighth Circuit has held, "[a]lthough there must be an escape from custody, it is not necessary that the escapee at the time of the escape be held under guard or under direct physical restraint or that the escape be from a conventional penal housing unit such as a cell or cell block; the custody may be minimal and, indeed, may be constructive." *U.S. v. Cluck*, 542 F.2d 728, 731 (8th Cir. 1976). These cases give a broad interpretation to "escape" in the federal statute. They read escape to include a failure to return, even if the initial escape did not involve anything resembling a physical leap over a prison wall. Thus, we can confidently label Ward as an escapee in the general meaning of the word. That said, the facts also doom Ward. When the marshals confronted him in the parking lot, Ward, in the words of the marshal, "gunned it, turned his wheel to drive around us, and took off." At the very latest, at this point—which was before the search of his room—Ward was a convicted felon affirmatively evading arrest.

[3] 389 U.S. 347 (1967).

[4] *Katz v. U.S.*, 389 U.S. 347, 360 (1967) (Harlan, concurring).

[5] *Id.* at 361.

the second of these two requirements that the Court has emphasized and on which we focus here.[6]

Our determination of whether an escapee's expectation of privacy is reasonable is informed by related Supreme Court precedent. In *Hudson v. Palmer* the Court made plain that because society is not prepared to recognize a prisoner's expectation of privacy in his prison cell, the Fourth Amendment, as a bright line rule, does not restrict searches and seizures in the cell.[7] The Court found the privacy right irreconcilable with both the institutional concern of security in the prison and with the punitive objectives of incarceration, namely retribution and deterrence.

That Ward would have had no right to privacy in his prison cell does not *a fortiori* mean that he has no right to privacy in his motel room. The interests at play for determining whether the Fourth Amendment applies to an escapee in society may differ from those applicable in the prison cell context. In other words, although the privacy right is personal, defining the specific content and incidents of the right often requires reference to a place—hence the *Hudson* opinion's repetition of the clause "in his prison cell." The Court's holding, specific to the cell, does not by its own force reach a motel room.

Exchanging the prison environment for a motel room[8] and the prisoner for a prison escapee, we find that the balance of interests weighs against finding a constitutionally protected reasonable expectation of privacy. We acknowledge that the consideration of internal security recognized in *Hudson* loses much its

---

[6] *Hudson v. Palmer*, 468 U.S. 517, 525 n.7 (1984).

[7] *Id.* at 525–26.

[8] That the search was of a motel room, and not of a private house or apartment, does not effect the analysis. *See Stoner v. California*, 376 U.S. 483, 490 ("No less than a tenant of a house, or the occupant of a room in a boarding house, a guest in a hotel room is entitled to constitutional protections against unreasonable searches and seizures.") (citing *Johnson v. U.S.*, 333 U.S. 10 (1948) (internal citations omitted)).

force when applied to justify circumscribing an escapee's privacy right. This justification is place specific. As explained in *Hudson*, "[a] right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional and internal order."[9] It is the challenge of the unique prison environment—exemplified by the prison administrator's constant fight to keep dangerous contraband out of the hands of a population that has demonstrated a proclivity for violence—that partially justifies that the privacy right in the cell be among the rights ceded by a convicted felon.

However, while institutional security loses some of its justifying force once a prisoner breaches the prison wall, we believe it remains indirectly at play. Recognizing a privacy right in the motel room of an escapee who legally belongs in a cell would "offer judicial encouragement to the act of escape."[10] Rewarding successful escapees by restoring previously ceded rights would embolden the escape plots that prison administrators already must work vigilantly to deter. Indirectly, then, society's interest in the security of its penal institutions remains relevant to determining whether an escapee has a reasonable expectation of privacy.

We need not however rely on indirect justifications. The institutional demands of the prison environment are not the sole justification for the prisoner's loss of liberty. Even assuming the justification of internal order and security falls away once a prisoner escapes the institution, an escapee privacy right remains incompatible with the objectives of incarceration. The loss of significant rights is an incident of imprisonment; the deprivation of privacy is a component of society's punishment.

---

[9] *Id.* at 527–28.

[10] *U.S. v. Roy*, 734 F.2d 108, 112 (2d Cir. 1984).

The rationales of punishment retain their full force both inside and outside the prison. A federal escapee remains in legal custody of the Federal Bureau of Prisons even when outside the prison walls. A prisoner cannot by escape rewrite his sentence such that his punishment no longer includes a loss of Fourth Amendment protected privacy. Society, through our system of justice, has retracted this privacy right from prisoners as a necessary incident of incarceration, imposed for the purposes of retribution, deterrence, and rehabilitation. We cannot find that this same society would recognize the escapee's expectation of that right as reasonable.[11]

There remains the additional consideration of protecting society. Incarcerated persons have demonstrated their propensity to engage in illegal, and often violent, behavior. The facts of this case exemplify this risk. Ward had a significant criminal history, including burglary and illegal firearm possession, and his recent behavior fleeing federal marshals in a dangerous automobile chase evidenced his willingness to place lives at risk. Ward's imprisonment was partially justified by incapacitation—removing his ability to inflict additional crimes on society. Prisoners that escape have frustrated this purpose, at the same time self-selecting themselves into an even more crime-prone subset.[12] Allowing an escapee to invoke the privacy right would be inconsistent with protecting society from a demonstrably dangerous person who is fleeing from law enforcement outside of the structured environment that the criminal justice

---

[11] We do not address privacy interests beyond those protected by the Fourth Amendment such as may be protected by the Eighth Amendment.

[12] While there are no ready statistics to document crime rates of escapees, reason warns it is likely higher than the already alarming recidivism rates for those legally released. In its most recent recidivism report, the Bureau of Justice Statistics studied recidivism in 272,111 prisoners released in 1994, representing two-thirds of all prisoners released in the United States that year. It found that 67.5% of released prisoners were rearrested for a new crime within 3 years, 46.9% were reconvicted for a new crime, and 25.4% were resentenced to prison. PATRICK A. LANGAN & DAVID J. LEVIN, BUREAU OF JUSTICE STATISTICS, RECIDIVISM OF PRISONERS RELEASED IN 1994 (June 2002).

system determined was necessary for him. In this game of hide and seek the sheriff need not count to ten.

We, therefore, join the Second[13] and Eighth[14] Circuits in finding that prison escapees cannot invoke the protections of the Fourth Amendment.

## III

The Supreme Court has not addressed whether an escaped felon may invoke the Fourth Amendment. It has held that prisoners have no protection under the Fourth Amendment from searches of their cell, a per se rule. At the same time, the Court has taken a different tack in its analysis in the related cases of paroled felons and probationers.[15] In these cases the Court assumed the petitioner could invoke the Fourth Amendment; that the parolee and probationer had a right to have the search measured by reasonableness, deploying an ad hoc "totality of the circumstances" balancing test. Under this test, the Court found that the balance tipped in favor of the government. "By their status alone," probationers and parolees have only a limited privacy right,[16] one that when weighed against the government's penological interests in restoring rights of liberty in a measured way yields to warrantless searches.

---

[13] In *Roy*, 734 F.2d at 108–12, a police officer pulled over an escapee's car after noticing it sitting suspiciously in a retail parking lot. Without knowledge that Roy was an escapee, the officer searched the interior of the car and its locked trunk, uncovering a profusion of illegal and dangerous items, including sawed off shotguns. Reversing the district court's grant of Roy's motion to suppress, the Second Circuit, analogizing an escapee to a "trespasser on society," held that Roy's "expectation of privacy in the automobile is not one that society is prepared to recognize as legitimate."

[14] In *U.S. v. Lucas*, 499 F.3d 769, 779 (8th Cir. 2007) (en banc), the court held that an escapee "had no legitimate expectation of privacy while hiding out in [a friend's] apartment."

[15] *U.S. v. Knights*, 534 U.S. 112 (2001) (upholding the warrantless search of a probationer's apartment on probable cause); *Samson v. Cal.*, 547 U.S. 846 (2006) (upholding the warrantless and suspicionless search of a parolee).

[16] "[B]y virtue of their status alone, probationers do not enjoy the absolute liberty to which every citizen is entitled." *Samson*, 547 U.S. at 849–50 (quoting *Knights*, 534 U.S. at 119) (internal quotations omitted).

Although the Court employed a "reasonableness" analysis in these cases instead of the *Katz* test it had earlier used to determine that prisoners, as an antecedent matter, could not invoke the Fourth Amendment, the determinative factor is the same under either approach—the petitioner's status. It is the status of probationers and parolees that results in their reduced expectation of privacy, a diminished right that could be outweighed by government interests. Similarly, it was status that drove the *Katz* analysis for prisoners in *Hudson v. Palmer*; as a per se rule a prisoner cannot invoke the Fourth Amendment because society is not prepared to recognize a prisoner's expectation of privacy in his prison cell.

We do not ponder the precise approach the Supreme Court would take in this case. Even were we to balance a diminished right against the interest of the government, the expectation of privacy of the probationer and parolee would offer no solace to Ward. Escape is a frustration of ordered justice that cannot be rewarded with rights greater than those held by felons that leave or avoid prison lawfully.

## IV

This said, there remains the nagging risk of invading the privacy rights of third parties attending the warrantless pursuit of escaped prisoners. By his legal status an escaped felon is walking probable cause—police can arrest and, as we have explained, search his dwelling and his bag without a warrant and without justification under the Fourth Amendment. This makes important the circumstance that the motel room at issue in this case was Ward's own, not just to the presence of probable cause to enter the room, but also in justification of a warrantless search of the bag when officers learned on entry that Ward was not then in his room. We pause to remind that in recapturing escaped prisoners,

8

law enforcement may well encounter the hurdles of the Fourth Amendment rights of third parties.[17]

We are persuaded that Ward, as a prison escapee, could not invoke the Fourth Amendment to suppress a warrantless search of his motel room and bag. The district court did not err in rejecting Ward's motion to suppress. The judgment of conviction and sentence is AFFIRMED.

---

[17] *See Steagald v. U.S.*, 451 U.S. 204, 215 (1981) (requiring, in the absence of consent or exigent circumstances, a search warrant before law enforcement could search the home of a third party for the subject of an arrest warrant).