PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-4767
_____

UNITED STATES OF AMERICA,
                                        Appellant

v.

JOSEPH P. DONAHUE
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Crim. No. 3:11-cr-00033)
Honorable A. Richard Caputo, District Judge
_____

Argued June 10, 2014

BEFORE: AMBRO, GREENBERG, and BARRY,
Circuit Judges

(Filed: August 22, 2014)
_____

Peter J. Smith, Esq.
Todd K. Hinkley, Esq. (argued)
Office of United States Attorney
235 North Washington Avenue
P.O. Box 309, Suite 311
Scranton, PA 18503

   Attorneys for Appellant


Gino A. Bartolai, Jr., Esq. (argued)
88 North Franklin Street
Wilkes-Barre, Pennsylvania 18701

   Attorney for Appellee

_____

OPINION OF THE COURT
_____


GREENBERG, Circuit Judge.

## I.  INTRODUCTION

In light of the "automobile exception" to the usual search warrant requirement, it is difficult to pick a worse place to conceal evidence of a crime than an automobile.  The Supreme Court has interpreted—and reinterpreted—the automobile exception so expansively that the Court essentially has obviated

2

the requirement that the government obtain a warrant to search a vehicle provided it has probable cause to believe that the vehicle contains evidence of a crime. Nevertheless, appellee Joseph Donahue made a successful challenge in the District Court to the warrantless search of a vehicle that he had been driving but did not own because the Court accepted his contention that the government did not have probable cause for the search. The government appeals from the suppression order entered on November 19, 2013.

We trace the immediate background of this case to Donahue's conviction for fraud and related offenses and the resulting ten-year custodial sentence that a district court imposed on him in the Middle District of Pennsylvania. The court directed Donahue to surrender by a given time at a designated place to serve this sentence but he did not do so. Consequently, the court issued a warrant for his arrest and a short time later United States marshals apprehended Donahue in Las Cruces, New Mexico, while he was in his son's Ford Mustang. The marshals took possession of the Mustang and, over the next five days, personnel from two different federal agencies searched the vehicle several times, photographed, and even x-rayed it, all without applying for or obtaining a search warrant. Eventually an FBI agent found a firearm magazine clip under the Mustang's driver's seat, a discovery that led to their finding a semi-automatic pistol in a bag that they had seized from the Mustang's trunk.

Donahue's failure to surrender and the recovery of the pistol resulted in a grand jury returning indictments against him in the Middle District of Pennsylvania for failure to surrender

3

under 18 U.S.C. §§ 3146(a)(2) and (b)(1)(A)(i) and for firearms offenses under 18 U.S.C. §§ 922(g)(1), (2), 922(j), and 924(a)(2). Donahue filed a motion to suppress evidence found in the Mustang and in a hotel room in Las Cruces in which he had registered under a false name. The District Court granted the motion on the ground that the government lacked probable cause for the searches. United States v. Donahue, No. 3:11-cr-00033, 2013 WL 6080192, at *6 (M.D. Pa. Nov. 19, 2013). The government appealed from the suppression order to the extent that the Court suppressed evidence found in the Mustang. The government, however, did not appeal from the portion of the order suppressing the evidence seized in the hotel room.

Even though it is clear that the government had the opportunity to seek a warrant before searching the Mustang, we hold that the automobile exception to the warrant requirement obviated its need to do so as the government had probable cause for the search of the Mustang and its contents.[1] Inasmuch as the automobile exception was applicable, there were virtually no temporal, physical, or numerical limitations on the search's scope. Thus, the government could make a broad search of the Mustang including its contents, even if contained in packages—and could repeat the search as long as it remained in continuous control of the Mustang.[2] The government took advantage of this

---

[1]As we explain later, there were several searches of the Mustang and, because the initial search was lawful, the searches that followed also were lawful here. Therefore, we sometimes refer to all of the searches as a single search.

[2]We are not concerned in this opinion with a situation in which

4

broad authority and, in making its search lawfully uncovered evidence that Donahue had committed weapons-related offenses. Consequently, the District Court should not have suppressed the evidence the government seized in the search. Accordingly, we will reverse the order suppressing the evidence seized in the search of the Mustang and its contents and we will remand the case to the District Court for further proceedings.

## II. FACTUAL BACKGROUND

Donahue enticed individuals to engage in his business ventures so that he could appropriate their identities and make unauthorized purchases using their credit. This scheme led to his conviction for 16 counts of bank fraud, money laundering, accessing an unauthorized device, and making false statements. United States v. Donahue, 460 F. App'x 141 (3d Cir. 2012) (affirming conviction). On December 3, 2010, the District Court sentenced Donahue to a 121-month custodial term and ordered him to pay $325,414 in restitution. Id. at 142. The Court directed Donahue to surrender by January 4, 2011, at his place of confinement at Fort Dix, New Jersey.

Donahue, however, did not surrender as ordered, and consequently the District Court issued a warrant for his arrest on January 5, 2011. Instead of surrendering, Donahue drove across the country in his son's red Ford Mustang to Las Cruces in an attempt to avoid imprisonment. This attempt came to naught

the government's control of the vehicle was not continuous.

when United States marshals in Scranton, Pennsylvania, in the Middle District of Pennsylvania, became aware that Donahue might be in Las Cruces and notified authorities there of that information. Two weeks after Donahue should have surrendered, United States marshals in Las Cruces, assisted by New Mexico State University police, arrested him near the campus when they saw him exit a hotel in which he had registered under an alias and enter his son's Mustang. United States Marshal Steven Archuleta and other officers ordered Donahue to exit the Mustang and he did so without incident. Archuleta then arrested and searched him, finding about $2,500 in cash.

After Archuleta handcuffed Donahue and took him to his patrol car, he looked into the Mustang and saw a "very messy" interior, J.A. 123, containing, among other items, various maps in plain view. Following instructions from his supervisor and a deputy United States marshal in Scranton, Archuleta seized the Mustang—a step that he acknowledged he "probably" would not have taken without those orders. J.A. 155. Inasmuch as Archuleta did not know "exactly what [evidence] was needed," J.A. 147, he also entered Donahue's hotel room to take the trash from it and to conduct a superficial search: he glanced around the room but did not open any drawers or look into the closets. As we have indicated, the government did not have a warrant for these searches.

The government subsequently transferred the Mustang to a marshals' facility in Las Cruces, where the marshals searched it pursuant to their inventory policy. Archuleta and two other deputy marshals photographed the vehicle "without essentially

6

moving anything around," J.A. 124, searched its trunk and cabin (including the glove box and other compartments), and removed loose items. This process revealed non-incriminating items and closed bags, which at that time the marshals did not open. The marshals then transferred the vehicle to a public garage and placed the bags and other items that they removed in a secure holding area.

The next day, again under instructions from Scranton—this time from an FBI regional office—an FBI agent in New Mexico, Amy Willeke, retrieved the Mustang and drove it to an FBI facility. When Willeke reached the FBI facility, she made a second inventory search of the Mustang during which she discovered a Glock .40 caliber magazine behind the driver's seat.

After logging her discovery into evidence and having the car x-rayed, Willeke directed another agent to obtain Donahue's loose items that the Marshals still possessed so that FBI agents could inventory the items and transfer them to Scranton. On January 25, 2011, five days after Donahue's arrest, Archuleta and an FBI agent opened and searched the previously seized bags and found a Glock semi-automatic pistol.

### III.  PROCEDURAL BACKGROUND

The foregoing events led a grand jury in the Middle District of Pennsylvania to return an indictment against Donahue for failure to surrender and for weapons charges. Donahue

7

subsequently moved in the District Court to suppress all the evidence seized from the Mustang and the hotel room, arguing that the warrantless searches were unreasonable under the Fourth Amendment. After a hearing, the Court granted Donahue's motion by order dated November 19, 2013. Donahue, 2013 WL 6080192.

Before addressing the substance of Donahue's motion, the District Court found that he had standing to challenge the searches even though he had registered in the hotel under an alias and did not own the Mustang. Id. at *3-5. The Court then held that the conditions for the automobile exception, which, if applicable, would have allowed the government to make a warrantless search of the Mustang, had not been met because the government lacked probable cause to believe that there was contraband in the vehicle. Id. at *6.[3]

The government appeals, making only one of the arguments it raised in the District Court. Challenging the basis for the Court's order head-on, the government contends that it had probable cause to search the Mustang because it was reasonable to believe that Donahue would be in possession of items that could help him avoid detection and that the possession of those items would support a charge that he knowingly failed to surrender to serve his sentence. Appellant's br. at 13-14. According to the government, none of the items

---

[3] Although Donahue at oral argument on this appeal emphasized that the government did not have a search warrant, in his brief he does not contend that it needed a warrant to make the search regardless of whether it had probable cause for the search.

found in plain view in the Mustang, including the materials that were not contraband (such as maps, newspapers and luggage) should have been suppressed. That evidence, the argument runs, though not contraband, helped establish probable cause for the government to conduct a full search of the vehicle. The evidence also tended to show that Donahue had planned his flight and acted deliberately in violation of the statute, 18 U.S.C. § 3146(a)(2), that criminalizes knowing failures to surrender, and that his failure to surrender was not the result of circumstances beyond his control. The latter point was significant because if it could be shown that circumstances beyond Donahue's control had precluded him from surrendering as ordered, Donahue would have had an affirmative defense to the failure-to-surrender charge, see 18 U.S.C. § 3146(c). Appellant's br. at 16-17.


## IV.  JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction under 18 U.S.C. § 3231,[4] and we have jurisdiction under 18 U.S.C. § 3731. "We review a district court's grant of the motion to suppress for clear error as to the underlying facts, but exercise plenary review as to its legality in light of the court's properly found facts." United States v. Crandell, 554 F.3d 79, 83 (3d Cir. 2009) (internal quotation marks, brackets, and citation omitted). On

---

[4] Donahue does not contend on this appeal that under U.S. Const. art. 3, § 2, cl.3, venue for the weapons charges should have been in the District of New Mexico.

this appeal we exercise only plenary review, as there is no dispute of any material fact.

## V.  DISCUSSION

The Fourth Amendment protects people from "unreasonable searches and seizures" of their "persons, houses, papers, and effects."  U.S. Const. amend. IV.  But this protection is triggered only if the state invades an area in which the person has a "constitutionally protected reasonable expectation of privacy."  New York v. Class, 475 U.S. 106, 112, 106 S.Ct. 960, 965 (1986) (quoting Katz v. United States, 389 U.S. 347, 360, 88 S.Ct. 507, 587 (1967) (Harlan, J., concurring).  Thus, a defendant moving to suppress evidence seized in a search "bears the burden of proving not only that the search . . . was illegal, but also that he had a legitimate expectation of privacy" in the subject of the search.  Rawlings v. Kentucky, 448 U.S. 98, 104, 100 S.Ct. 2556, 2561 (1980).  The latter inquiry turns on two specific questions:  "(1) whether the individual demonstrated an actual or subjective expectation of privacy in the subject of the search or seizure; and (2) whether this expectation of privacy is objectively justifiable under the circumstances."  Free Speech Coal., Inc. v. Att'y Gen., 677 F.3d 519, 543 (3d Cir. 2012).

After our initial examination of this appeal, we requested supplemental briefing on the question of whether Donahue, who was a fugitive,[5] could assert that he had a reasonable expectation

[5]Although Donahue admits that he was apprehended across the

10

of privacy in any seized object. We also directed that the briefs address the question of whether the government had preserved an expectation-of-privacy issue for our review. In this regard we note that inmates generally do not possess a legitimate expectation of privacy, <u>Hudson v. Palmer</u>, 468 U.S. 517, 525-26, 104 S.Ct. 3194, 3200 (1984), and other courts of appeals have held that prisoners do not re-acquire the right to such an expectation when they escape from prison, <u>United States v. Lucas</u>, 499 F.3d 769, 777 (8th Cir. 2007) (en banc); <u>United</u>

---

country from New Jersey where he was to surrender to start serving his period of incarceration, he insists that he was not a "fugitive" even though the District Court had issued a warrant for his arrest when he did not surrender. Appellee's supplemental br. at 2-3. He cites a firearms-control statute that defines a "fugitive from justice" as someone who "has fled from any State to avoid prosecution." 18 U.S.C. § 921(a)(15). Donahue's logic, it appears, is that he fled the consequences of his prosecution (i.e., incarceration), rather than the prosecution itself. <u>But see</u>, <u>e.g.</u>, <u>United States v. Bailey</u>, 444 U.S. 394, 414 n.10, 100 S.Ct. 624, 636 n.10 (1980) ("[A]n escaped prisoner is, by definition, a fugitive from justice."). We do not comment on whether his interpretation of that particular statute is relevant because Donahue's exact technical status as a fugitive does not bear on our probable-cause inquiry. Regardless of what circumstances result in an individual being regarded as a fugitive under any particular statute, the ordinary meaning of the word includes "[a] person who flees or escapes" and a "criminal suspect . . . who . . . evades . . . imprisonment." <u>Black's Law Dictionary</u> (9th ed. 2009) (defining "fugitive"). Consequently, we will refer to Donahue as a fugitive.

11

States v. Roy, 734 F.2d 108, 111-12 (2d Cir. 1984), or when they abscond after a mistaken release, United States v. Ward, 561 F.3d 414, 417-18 (5th Cir. 2009). See United States v. Randolph, 210 F. Supp. 2d 586, 591 (E.D. Pa. 2002), aff'd, 80 F. App'x 190 (3d Cir. 2003).

Although Donahue may have forfeited any expectation of privacy that he arguably had in the Mustang or its contents after he failed to surrender, we decline to address that possibility because the government did not raise it in the District Court and thus did not preserve it for our review. See Steagald v. United States, 451 U.S. 204, 208-11, 101 S.Ct. 1642, 1646-47 (1981) (precluding government from arguing for the first time on appeal that defendant lacked a reasonable expectation of privacy); see also United States v. Joseph, 730 F.3d 336, 342 (3d Cir. 2013). Rather, the government made the expectation-of-privacy argument in the District Court that Donahue did not have an expectation of privacy in the Mustang or its contents or in the hotel room in the first place, a contention that, if accepted, would have rendered a forfeiture argument moot as Donahue would have had nothing to forfeit. The government, however, has abandoned even that narrow contention on appeal.

Given that the government has not advanced, or at least preserved for our review, any expectation-of-privacy issue on this appeal, we limit our inquiry to the question of whether the automobile exception authorized the government to search the Mustang without a warrant.[6] The automobile exception permits

---

[6] The District Court declined to apply the inventory exception or the inevitable discovery rule—conclusions that the government

vehicle searches without a warrant if there is "probable cause to believe that the vehicle contains evidence of a crime." United States v. Salmon, 944 F.2d 1106, 1123 (3d Cir. 1991), abrogated on other grounds by United States v. Caraballo-Rodriguez, 726 F.3d 418 (3d Cir. 2013) (en banc). The government bears the burden of establishing the applicability of the exception, United States v. Herrold, 962 F.2d 1131, 1143 (3d Cir. 1992), by a preponderance of the evidence, United States v. Vasey, 834 F.2d 782, 785 (9th Cir. 1987).

Although "the scope of the warrantless search authorized by [the automobile exception] is no broader and no narrower than a magistrate could legitimately authorize by warrant,"

---

does not challenge on appeal. Donahue, 2013 WL 6080192, at *7-11. In addition, although the government alluded to another, similar exception in its brief in the District Court, it never fully argued here or in that Court that it performed a valid search of the car incident to Donahue's arrest. Case No. 3:11-cr-00033, Doc. No. 188 at 8. That justification permits vehicle searches incident to arrest if it is "reasonable to believe evidence relevant to the crime of arrest might be found." Arizona v. Gant, 556 U.S. 332, 335, 129 S.Ct. 1710, 1714 (2009). The Gant incident-to-arrest exception is both broader and narrower than the automobile exception: it requires a lesser basis for a search than a showing of probable cause, United States v. Vinton, 594 F.3d 14, 25 (D.C. Cir. 2010), but "does not extend to evidence of other offenses," United States v. Polanco, 634 F.3d 39, 42 (1st Cir. 2011). Because of the limited scope of the government's arguments, we consider only one potentially relevant exception to the search warrant requirement, the automobile exception.

13

United States v. Ross, 456 U.S. 798, 825, 102 S.Ct. 2157, 2173 (1982), the automobile exception includes two important elements specific to that exception: First, "[i]f probable cause justifies the search . . . , it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." Id., 102 S.Ct. at 2173. Second, probable cause does not dissipate after the automobile is immobilized because the exception does not include an exigency component. Maryland v. Dyson, 527 U.S. 465, 466, 119 S.Ct. 2013, 2014 (1999). As a result, the government can search an impounded vehicle without a warrant even though it has secured the vehicle against the loss of evidence and it has the opportunity to obtain a warrant for the search. See Michigan v. Thomas, 458 U.S. 259, 261, 102 S.Ct. 3079, 3080-81 (1982); see also United States v. Johns, 469 U.S. 478, 486-87, 105 S.Ct. 881, 886 (1985) (extending the rule to closed packages seized from vehicles).

The broad sweep of the automobile exception is of controlling significance in this case because if we determine, as in fact we do, that the government had probable cause to seize and search the Mustang, two more conclusions will follow from that determination. First, the government was justified in opening the bag found in the Mustang's trunk containing the pistol. See, e.g., United States v. Alexander, 573 F.3d 465, 475 (7th Cir. 2009) ("[U]nder the automobile exception to the warrant requirement, [the police officers] were authorized to open the bag and seize the handgun."). Second, the delay between the time that the government seized the Mustang and the time of the search that uncovered the weapon—five days after the government impounded the vehicle—was immaterial. See Johns, 469 U.S. at 487-88, 105 S.Ct. at 887 (holding that

14

warrantless search of containers seized from a vehicle already impounded for three days "was reasonable and consistent with our precedent involving searches of impounded vehicles"); United States v. Gastiaburo, 16 F.3d 582, 586 (4th Cir. 1994) (upholding warrantless search of a vehicle 38 days after it was impounded); United States v. McHugh, 769 F.2d 860, 865-66 (1st Cir. 1985) (approving search seven days after truck's seizure because the Supreme Court declined to impose an "arbitrary temporal restriction" on the automobile exception).[7]

As a related matter, our analysis does not distinguish among the government's searches starting with Archuleta's search, followed by Willeke's search, and concluding with the opening of the closed bags. We see nothing in the Supreme Court's jurisprudence to indicate that the automobile exception may justify only a single search of a seized vehicle. To the contrary, the Court has based its reasoning allowing warrantless searches of vehicles in part on the diminished expectation of privacy in a vehicle, and thus the Court's reasoning supports the conclusion that so long as the government maintains continuous control over the vehicle it needs probable cause only for its initial search and seizure and that subsequent searches should be viewed as part of an ongoing process. United States v. Chadwick, 433 U.S. 1, 12, 97 S.Ct. 2476, 2484 (1977) ("One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects . . . . It travels public thoroughfares where both its occupants and its contents are in

---

[7] Donahue has not raised any chain-of-custody issue.

plain view." (quotation marks and citation omitted)). The degree of expectation of privacy does not expand during the time that the government possesses the vehicle. Indeed, if anything, the seizure may lessen it.

Thus, the validity of the search in this case depends entirely on whether the government had probable cause when it seized the Mustang to believe that it contained evidence of a crime.[8] The probable cause inquiry is "commonsense," "practical," and "nontechnical;" it is based on the totality of the circumstances and is judged by the standard of "reasonable and prudent men." Illinois v. Gates, 462 U.S. 213, 230-31, 103 S.Ct. 2317, 2328 (1983) (internal quotation marks and citations omitted). We evaluate "the events which occurred leading up to the . . . search, and then . . . [decide] whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to . . . probable cause." Ornelas v. United

---

[8] Contrary to the government's suggestion, a showing that there is probable cause to believe that a search will reveal evidence refuting a potential affirmative defense does not, by itself, authorize a search. In this regard, we point out that inasmuch as the government before making an arrest and search based on the presence of probable cause is not obligated to investigate potential defenses, see, e.g., Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 11 (1st Cir. 2004), it should not be permitted to use the possibility that those defenses may be available as a reason to invade an individual's right to privacy by making a search. What matters for purposes of probable cause is the likelihood of obtaining evidence of a crime.

16

States, 517 U.S. 690, 696, 116 S.Ct. 1657, 1661-62 (1996).

At bottom, "we deal with probabilities," Gates, 462 U.S. at 231, 103 S.Ct. at 2328. If there was a "fair probability that contraband or evidence of a crime" would have been found, there was probable cause for the search. Id. at 238, 103 S.Ct. at 2332. To that end, we conclude that it was reasonable to believe that the Mustang contained items showing that Donahue "knowingly" failed to surrender in violation of 18 U.S.C. § 3146(a)(2). After all, the government agents knew that Donahue had failed to surrender as ordered, and Archuleta explained that, based on his extensive experience with fugitives, they are likely to have false identification documents, J.A. 109, which commonly are found in places where items are "ready and available . . . to gather up and leave quickly," such as their cars, id. 108-11.

The District Court took a different approach to the probable cause question. It focused on Archuleta's concession at the suppression hearing that he searched the Mustang because the marshals in Scranton wanted him to do so. This testimony led the Court to suggest that Archuleta did not necessarily believe he had probable cause for the search. Donahue, 2013 WL 6080192, at *7. The Court also concluded that the items in plain view, such as maps and newspapers, which Archuleta observed when he first looked into the Mustang, were not contraband and thus their presence could not have formed the basis for probable cause for a search of the vehicle. Id. Finally, the Court reasoned that Donahue's "crime was completed after he failed to surrender for service of his sentence" and, "[a]s a result, there was not a fair probability that a search of the Ford

17

Mustang would reveal contraband or evidence of a crime." Id.

We reject each of these conclusions, and do so exercising plenary review because the District Court did not ground its conclusions on findings of disputed facts. See Ornelas, 517 U.S. at 699, 116 S.Ct. at 1663; United States v. Harple, 202 F.3d 194, 196 (3d Cir. 1999). First, we point out that our probable cause inquiry "is entirely objective," Halsey v. Pfeiffer, 750 F.3d 273, 299 (3d Cir. 2014), and that while subjective belief may be relevant in a probable cause inquiry to the extent that it reveals facts material to a probable cause determination, Archuleta's testimony with respect to his beliefs was not particularly enlightening in this regard. Furthermore, we find nothing in the record to support a conclusion that Archuleta conceded he lacked probable cause to search the Mustang; rather he testified that the immediate reason he undertook the search was that he was carrying out the instructions sent from Scranton and the directive from his supervisor. But his statements about fugitives possessing incriminating material is consistent with the conclusion that he believed that he had probable cause for the search. See J.A. 122 ("I did believe that there could be items in the vehicle to show that he was a fugitive and certain contraband could be in that vehicle, yes, sir."). In any event, Archuleta's opinion as to whether he had probable cause for a search does not matter because an officer might have probable cause to make a search even if he believes to the contrary. See United States v. Anderson, 923 F.2d 450, 457 (6th Cir. 1991) ("Just as a subjective belief by the arresting officer would not establish probable cause where none existed, a subjective belief by the arresting officer cannot destroy probable cause where it exists.").

18

We also reject the District Court's suggestion that an officer could establish that there was probable cause for a search only if he believed that the search would reveal contraband. Donahue, 2013 WL 6080192, at *7 (concluding that the items that Archuleta observed in the Mustang were "not contraband" and thus their presence could not support the belief that the Mustang "contained contraband"). The courts in making Fourth Amendment analyses long have rejected any distinction between "evidence of a crime" and "contraband." See Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 301, 87 S.Ct. 1642, 1647 (1967) ("Nothing in the language of the Fourth Amendment supports the distinction between 'mere evidence' and instrumentalities, fruits of crime, or contraband."). And as we have indicated throughout this opinion, the prevailing standard for establishing probable cause refers interchangeably to probable cause for the presence of both contraband and evidence of a crime.

Finally, we reject any contention that the answer to the question of whether a crime has been "completed" (as the District Court suggested was the case here when Donahue did not surrender as required) or was "continuous" could provide a tool helpful in an assessment of whether there was probable cause for a search. After all, many, if not most, crimes are "completed" by the time of a lawful search during the investigation of the crime, and frequently the perpetrator has been identified before the search, but investigators nevertheless make the search to uncover evidence useful in a prosecution. The determination of the point at which the elements constituting a crime can be said to have been completed is simply not material to a court's determination of whether there

was probable cause for a search in furtherance of the investigation of the crime. Accordingly, though it is clear from the record that the government had compelling evidence that Donahue had committed the crime of failing to surrender before its agents searched his vehicle, indeed even before its agents arrested him, and such evidence might have lessened the need for a search, the search was lawful.

## VI.  CONCLUSION

For the foregoing reasons, we will reverse the District Court's November 19, 2013 order suppressing evidence found in the Ford Mustang.  Because the government has not appealed from the order to the extent that it suppressed evidence taken from Donahue's hotel room, that aspect of the Court's order will remain undisturbed.  We will remand the case to the District Court for further proceedings consistent with the opinion.