**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-4085
_____

FREE SPEECH COALITION, INC.; AMERICAN
SOCIETY OF MEDIA
PHOTOGRAPHERS, INC.; MICHAEL BARONE;
DAVID CONNERS
a/k/a DAVE CUMMINGS; THOMAS HYMES;
TOWNSEND ENTERPRISES, INC. d/b/a SINCLAIR
INSTITUTE;
C1R DISTRIBUTION, LLC d/b/a CHANNEL 1
RELEASING; BARBARA ALPER; CAROL QUEEN;
BARBARA NITKE; DAVID STEINBERG;
MARIE L. LEVINE a/k/a NINA HARTLEY; DAVE
LEVINGSTON;
BETTY DODSON; CARLIN ROSS

v.

ATTORNEY GENERAL OF THE UNITED STATES

Free Speech Coalition, Inc.;
American Society of
Media Photographers, Inc.;
Michael Barone; David Conners a/k/a Dave Cummings;
Thomas Hymes; Townsend Enterprises, Inc. d/b/a

1

Sinclair Institute;
Barbara Alper; Carol Queen; Barbara Nitke;
David Steinberg;
Marie L. Levine a/k/a Nina Hartley; Dave Levingston;
Betty Dodson; Carlin Ross,
                              Appellants

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(District Court  No. 2-09-cv-04607)
District Judge: The Honorable Michael M. Baylson

Argued January 11, 2012

Before: SCIRICA, RENDELL, and SMITH,
*Circuit Judges*

(Filed:  April 16, 2012)

Lorraine R. Baumgardner
J. Michael Murray (Argued)
Berkman, Gordon, Murray & De Van
Suite 2200
55 Public Square
2121 The Illuminating Building
Cleveland, OH  44113

Kevin E. Raphael
J. Peter Shindel, Jr.
Pietragallo, Gordon, Alfano, Bosick & Raspanti
1818 Market Street

Suite 3402
Philadelphia, PA 19103
    *Counsel for Appellants*

Thomas M. Bondy
United States Department of Justice
Civil Division
Room 7535
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Anne Murphy (Argued)
United States Department of Justice
Appellate Section 7644
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Kathryn Wyer
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Room 7130
Washington, DC 20530
    *Counsel for Appellee*

Fred T. Magaziner
Dechert
2929 Arch Street
18th Floor, Cira Centre
Philadelphia, PA 19104

Mary Catherine Roper
American Civil Liberties Union of Pennsylvania

P.O. Box 40008
Philadelphia, PA 19106

> *Counsel for Amicus Appellant American Civil
> Liberties Union of Pennsylvania*

Steven W. Fitschen
The National Legal Foundation
2224 Virginia Beach Boulevard
Suite 204
Virginia Beach, VA 23454

> *Counsel for Amicus Appellee The National Legal
> Foundation*

_____

OPINION

_____

SMITH, *Circuit Judge.*

Plaintiffs, a collection of individuals and entities involved with various aspects of the adult media industry, brought this action challenging the constitutionality of 18 U.S.C. §§ 2257 and 2257A (the "Statutes"), which are criminal laws imposing recordkeeping, labeling, and inspection requirements on producers of sexually explicit

depictions.[1] Plaintiffs also challenge the constitutionality of certain regulations promulgated pursuant to the Statutes. Plaintiffs claim that the Statutes and regulations violate, *inter alia*, various provisions of the First, Fourth, and Fifth Amendments to the U.S. Constitution—as applied and facially—and seek declaratory and injunctive relief.

The government moved to dismiss Plaintiffs' complaint in its entirety for failure to state a claim under Fed. R. Civ. P. 12(b)(6), and with respect to Plaintiffs' Fourth

---

[1] Plaintiff-appellants include: Free Speech Coalition, Inc. ("FSC"), a trade association representing more than 1,000 member businesses and individuals involved in the production and distribution of adult materials; American Society of Media Photographers, Inc., a trade association for photographers; Townsend Enterprises, Inc., a producer and distributor of adult materials created for the purpose of educating adults about sexual health and fulfillment; David Conners, a.k.a. Dave Cummings, a producer of—and performer in—adult movies; Carol Queen, a sociologist, sexologist, and feminist sex educator; Marie L. Levine, a.k.a Nina Hartley, an actress appearing in more than 650 adult films; Betty Dodson, a sexologist, sex educator, author, and artist; Carlin Ross, who hosts a website with Dodson providing individuals ashamed of their genitalia with a forum for anonymously discussing and posting images of their genitalia; Michael Barone, a photographer who creates erotic portraits; Thomas Hymes, a journalist who operates a website related to the adult industry; Barbara Alper, a commercial photographer; Barbara Nitke, a faculty member for the School of Visual Arts in New York City and a photographer; David Steinberg, a photographer; and Dave Levingston, a photographer (collectively, "Plaintiffs").

Plaintiff C1R Distribution, LLC did not appeal the District Court's order.

Amendment claim, for lack of subject matter jurisdiction on ripeness and standing grounds under Fed. R. Civ. P. 12(b)(1). The government also asserted that two of the Plaintiffs—FSC and Conners—were barred by issue preclusion from asserting that § 2257 violates the First Amendment. Plaintiffs opposed the government's motion and moved for leave to amend their Fourth Amendment claim.

The District Court granted the government's motion, dismissed the complaint in its entirety, and denied Plaintiffs' motion for leave to amend their complaint. Plaintiffs appealed. We will vacate the District Court's order to the extent that it: dismissed in their entirety Plaintiffs' claims brought pursuant to the First Amendment (Count 1) and the Fourth Amendment (Count 4); dismissed Plaintiffs' claim for injunctive relief (Count 6) to the extent that it asserts a right to injunctive relief for violations of the First Amendment or the Fourth Amendment; and denied Plaintiffs leave to amend their Fourth Amendment claim. We will affirm the District Court's order in all other respects and remand the case for further proceedings.

## I. BACKGROUND

### A. BACKGROUND OF RELEVANT CHILD PORNOGRAPHY LEGISLATION

In 1978, Congress enacted the Protection of Children Against Sexual Exploitation Act of 1977 ("1977 Act"), Pub. L. No. 95-225, 92 Stat. 7 (1978) (codified as amended at 18 U.S.C. §§ 2251, 2252, and 2256), which criminalized the commercial use of children in sexually explicit materials. After the 1977 Act went into effect, much of the child pornography industry went underground and became noncommercial. *See Attorney General's Commission on Pornography, Final Report*, 408-09, 604-05 (1986) (the

"Report"). In response, Congress enacted the Child Protection Act of 1984 ("1984 Act"), Pub. L. No. 98-292, 98 Stat. 204 (codified as amended in various sections of 18 U.S.C., including §§ 2251-2254). The 1984 Act, *inter alia*, increased certain monetary penalties for distributing depictions of children engaged in sexual activity and broadened the protections of the 1977 Act to declare unlawful the production of noncommercial child pornography. Pub. L. No. 98-292 §§ 3 and 5 (no longer requiring that the production be for "pecuniary profit").

In 1986, the Attorney General's Commission on Pornography issued its final Report, which found that although the 1977 and 1984 Acts "drastically curtailed [child pornography's] public presence," they did not end the problem and that "no evidence . . . suggest[ed] that children [were] any less at risk than before." *See* Report at 608-09. The Report further found that producers of sexually explicit matter generally sought youthful-looking performers, which "has made it increasingly difficult for law enforcement officers to ascertain whether an individual in a film or other visual depiction is a minor." *Id.* at 618. The Report recommended that Congress "enact a statute requiring the producers, retailers or distributors of sexually explicit visual depictions to maintain records containing . . . proof of performers' ages." *Id.* at 618. The Report also recommended that the location of this information be identified "in the opening or closing footage of a film, the inside cover of the magazine, or standard locations in or on other material containing visual depictions," and that the information be "available for inspection by any duly authorized law enforcement officer upon demand as a regulatory function for the limited purposes of determining consent and proof of age." *Id.* at 620-21.

B.    SECTION 2257

7

In 1988, Congress enacted the Child Protection and Obscenity Enforcement Act, including § 2257, which adopted recordkeeping provisions similar to those recommended by the Report. *See* Pub. L. No. 100-690, § 7513, 102 Stat. 4485, 4487-88 (1988) ("1988 Act").

Section 2257, as amended, imposes three basic requirements on producers of adult media. First, any person who produces visual depictions of "actual sexually explicit conduct" must "create and maintain individually identifiable records pertaining to every performer portrayed." 18 U.S.C. § 2257(a). The term "actual sexually explicit conduct" is defined to mean actual but not simulated: sexual intercourse, bestiality, masturbation, sadistic or masochistic abuse, or lascivious exhibition of the genitals or pubic area of any person. *Id.* at (h)(1); 18 U.S.C. § 2256(2)(A). To ensure the reliability of these records, a producer subject to § 2257 must review each performer's photo identification and ascertain, *inter alia*, the performer's name and date of birth. 18 U.S.C. § 2257(b)(1). The producer must also ascertain any other name used by the performer in previous depictions. *Id.* at (b)(2). Second, a producer subject to § 2257 must "affix[] to every copy of any [visual depiction covered by § 2257] . . . a statement describing where the records required by [§ 2257] with respect to all performers depicted in that copy of the matter may be located." *Id.* at (e)(1). Third, producers must maintain copies of their performers' identification documents at their "business premises, or at such other place[s] as the Attorney General may by regulation prescribe and shall make such records available to the Attorney General for inspection at all reasonable times." *Id.* at (b)(3) and (c).

Producers subject to § 2257 may be exposed to criminal liability if they: "fail to create or maintain the records as required"; "knowingly . . . make any false entry in or knowingly . . . fail to make an appropriate entry in, any

8

[required] record"; "knowingly . . . fail to comply with the [labeling provisions of § 2257(e)]"; "knowingly sell or otherwise transfer, or offer for sale or transfer" any visual depiction subject to § 2257 that does not contain the label required by § 2257(e); or "refuse to permit the Attorney General or his or her designee for an inspection."  18 U.S.C. § 2257(f)(1)-(5).  First time violators of § 2257 may be imprisoned for not more than five years. *Id.* at (i).

C.    SECTION 2257A

Congress next promulgated the Adam Walsh Child Protection and Safety Act of 2006 ("2006 Act"), Pub. L. No. 109-248, § 503, 120 Stat. 587, including § 2257A.  In enacting the 2006 Act, Congress made numerous findings, including that a substantial interstate market in child pornography continued to exist and that many of the individuals in this market distributed child pornography with

9

the expectation of receiving the same in return.  *Id.*
§ 501(1)(B).[2]

Section 2257A regulates recordkeeping requirements
for visual depictions of *simulated* sexually explicit conduct—
as opposed to § 2257, which regulates *actual* sexually explicit
conduct.  The regulations implementing § 2257A defined
simulated sexually explicit conduct to mean

> conduct engaged in by performers that is
> depicted in a manner that would cause a
> reasonable viewer to believe that the performers
> engaged in actual sexually explicit conduct,
> even if they did not in fact do so.  It does not
> mean . . . sexually explicit conduct that is
> merely suggested.

28 C.F.R. § 75.1(o).  Section 2257A imposes the same
recordkeeping, labeling, and inspection requirements on
producers of these depictions as those required by § 2257.

---

[2] Statements by members of both the United States House of
Representatives and Senate demonstrated the importance they
attached to § 2257A in further combating child sexual
exploitation.  Representative Michael Pence, who introduced
language similar to that of § 2257A's recordkeeping and
labeling requirements in a previous bill, stated that his intent
in drafting that bill was to "prevent American children from
becoming victims of pornography," such as being "forced to
pose for pornographic pictures or act in pornographic videos."
152 Cong. Rec. H5705-01, H5724 (July 25, 2006).  Similarly,
Senator Mitchell McConnell stated that § 2257A "strengthens
the pornography recordkeeping and labeling requirements" of
the 1988 Act and "protect[s] children from exploitation by
pornographers." 152 Cong. Rec. S8012-02, S8024 (July 20,
2006).

First-time violators of § 2257A may be imprisoned for not more than one year where no minor child is involved or not more than five years where a minor is involved. 18 U.S.C. § 2257A(i).

Section 2257A(h) provides an exemption for certain commercial producers. Under this provision, producers may be exempted from § 2257A in its entirety and with respect to certain conduct regulated by § 2257. Under § 2257A(h), the provisions of §§ 2257A and 2257 "shall not apply to matter, or any image therein . . . of simulated sexually explicit conduct, or actual sexually explicit conduct [involving the lascivious exhibition of the genitals or pubic area of any person]" (the "Exempted Depictions") under either of two circumstances. The first circumstance is where the Exempted Depictions were: (1) "intended for commercial distribution"; (2) "created as part of a commercial enterprise by a person who certifies to the Attorney General that such person regularly and in the normal course of business collects and maintains individually identifiable information regarding all performers," such as the names, addresses, and dates of birth of the performers (the "Certification"); and (3) does not contain a depiction that an ordinary person would conclude was child pornography as defined by 18 U.S.C. § 2256(8). 18 U.S.C. § 2257A(h). The second circumstance is where the Exempted Depictions were: (1) subject to the authority and regulation of the Federal Communications Commission acting in its capacity to regulate the broadcast of obscene, indecent, or profane programming; and (2) created as part of a commercial enterprise and the Certification was made to the Attorney General. *Id.*

D.   REGULATIONS IMPLEMENTING §§ 2257 AND 2257A

The Department of Justice promulgated regulations implementing the Statutes.  These regulations define a producer as "any individual, corporation, or other organization who is a primary producer or a secondary producer."  28 C.F.R. § 75.1(c).  A primary producer is an individual or entity that "actually films, videotapes, photographs, or creates a digitally- or computer-manipulated image, a digital image, or a picture of . . . a visual depiction of an actual human being engaged in actual or simulated sexually explicit conduct."  *Id.* at (c)(1).  A secondary producer is any individual or entity who "produces, assembles, manufactures, publishes, duplicates, reproduces, or reissues" a visual depiction of an actual human being engaged in actual or simulated sexually explicit conduct that is intended for commercial distribution.  *Id.* at (c)(2).  Producers do not include: photo or film processors, distributors, or providers of telecommunications services.  *Id.* at (c)(4).

The regulations require primary and secondary producers to create and maintain copies of records reflecting the performers' legal names, dates of birth, stage names, and the date of the original production.  *See, e.g.*, 28 C.F.R. § 75.2(a).  Secondary producers may satisfy these requirements by accepting copies of the records created and maintained by primary producers.  *See id.* at (b).

Moreover, the regulations standardize record maintenance procedures.  The regulations set forth the manner in which the records are to be organized and require that these records be maintained separate from any other business records.  28 C.F.R. § 75.2(a)(3) and (e).  Producers may contract with a non-employee custodian of the records,

but such a contract does not relieve the producers of their liability under the Statutes. *Id.* at (h). Producers may make these records available for inspection either at their place of business or at the place of business for the non-employee custodian of records. 28 C.F.R. § 75.4.

### E. PROCEDURAL BACKGROUND

On October 7, 2009, Plaintiffs filed both a complaint challenging the constitutionality of the Statutes and a motion for a preliminary injunction. The complaint alleges that the Statutes are unconstitutional both as applied to Plaintiffs and facially pursuant to: the First Amendment (Count 1); the Fifth Amendment Equal Protection Clause (Count 2); the Fourth Amendment (Count 4); and the Fifth Amendment privilege against self-incrimination (Count 5). The complaint further alleges that certain regulations promulgated to implement the Statutes are unconstitutionally overbroad and vague, in particular 28 C.F.R. §§ 75.1(c)(1), 75.2(a)(4), and 75.6(a) (Count 3), and that Plaintiffs are entitled to preliminary and permanent injunctive relief with respect to the Statutes and regulations (Count 6).

On December 14, 2009, the government filed both its opposition to Plaintiffs' motion for a preliminary injunction and its motion to dismiss Plaintiffs' complaint in its entirety under Rule 12(b)(6) and dismiss Plaintiffs' Fourth Amendment claim under Rule 12(b)(1). On March 12, 2010, the District Court held oral argument on the government's motions, and subsequently the parties filed supplemental briefs.

On April 5, 2010, Plaintiffs moved for leave to amend their Fourth Amendment claim in response to ripeness challenges by the government. In the proposed amendment, Plaintiffs sought to assert additional allegations regarding

13

warrantless searches that took place pursuant to § 2257. The government opposed Plaintiffs' motion to amend.[3]

On September 17, 2010, the District Court granted the government's motion to dismiss and denied Plaintiffs' motion for leave to amend. The District Court found that plaintiffs FSC and Conners were collaterally estopped from challenging the constitutionality of § 2257 under the First Amendment because they previously challenged § 2257 in a federal action in Colorado, where that court granted partial summary judgment for the government.[4]

The District Court also determined that Plaintiffs failed to assert a claim under the First Amendment. As to Plaintiffs' as-applied challenge under the First Amendment, the District Court found that the Statutes were content neutral because the government's purpose in enacting the Statutes was to deter production and distribution of child pornography, not to express disagreement with the production of sexually explicit depictions. The District Court determined that the Statutes satisfy intermediate scrutiny because they: advance the significant governmental interest of protecting children from pornographers; are narrowly tailored because they implement uniform age-verification procedures that eliminate producers' subjectivity as to which performers must be age verified; and

---

[3] The District Court determined that it should rule on the government's motion to dismiss and Plaintiffs' motion to amend before deciding Plaintiffs' motion for a preliminary injunction. Consequently, on May 19, 2010, the District Court denied Plaintiffs' motion for a preliminary injunction without prejudice.

[4] The District Court ruled that FSC and Conners were not precluded from challenging the constitutionality of § 2257A because this statute was not at issue in the Colorado action.

14

leave open ample adequate alternative channels of communication because the Statutes do not ban expression.

The District Court concluded that Plaintiffs' First Amendment facial challenge failed because the Statutes were not overbroad. The court reasoned that Plaintiffs could not demonstrate that the claimed overbreadth was either substantial or that it posed a real danger as the government disavowed the enforcement of the Statutes beyond "pornography intended for sale or trade."

The District Court further concluded that Plaintiffs' Fourth Amendment claim failed as a matter of law because there was no search implicating the Fourth Amendment. The District Court determined that Plaintiffs have no reasonable expectation of privacy in the records subject to inspection, and in any event, the inspection program authorized by the Statutes constitutes a permissible, warrantless administrative search. The District Court further denied Plaintiffs' motion to amend their Fourth Amendment claim because such an amendment was futile.[5]

Plaintiffs appealed.

---

[5] Plaintiffs also asserted a number of other constitutional challenges to the Statutes, including that they: violated the First Amendment by imposing a prior restraint or precluding anonymous speech; unlawfully imposed strict liability for the failure to comply with certain recordkeeping provisions; violated the Fifth Amendment Equal Protection Clause by permitting some producers to be exempt; were unconstitutionally vague; and violated the Fifth Amendment privilege against self incrimination. The District Court analyzed these claims in detail, finding none tenable as a matter of law.

15

## II.   ANALYSIS

The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291. "Review of a dismissal of a complaint under Rule 12(b)(6) is plenary." *Stevenson v. Carroll*, 495 F.3d 62, 65 (3d Cir. 2007) (citing *Lake v. Arnold*, 112 F.3d 682, 684-85 (3d Cir. 1997)). Questions of subject matter jurisdiction raised on a motion to dismiss under Rule 12(b)(1) are also reviewed *de novo*. *See Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 163 (3d Cir. 2010).

### A.   CONSTITUTIONAL CHALLENGES TO SECTION 2257 IN OTHER CIRCUITS

In *American Library Association v. Reno* and *Connection Distributing Co. v. Holder*, discussed in greater detail *infra*, Courts of Appeals for the District of Columbia Circuit and Sixth Circuit upheld § 2257 against various constitutional challenges.[6]

### (1)   *American Library Association v. Reno*

The plaintiffs in *American Library Association* brought an as-applied First Amendment challenge to § 2257. *Am. Library Ass'n v. Barr*, 794 F. Supp. 412, 413 (D.D.C. 1992) ("*Am. Library*"), *rev'd sub nom. Am. Library Ass'n v. Reno*, 33 F.3d 78, 84 (D.C. Cir. 1995) ("*Am. Library II*"). The district court held that § 2257 was unconstitutional because it was not narrowly tailored and did not leave open ample alternative channels for communication. *Am. Library*,

---

[6] The parties have not cited—and we are unaware of—any published appellate decisions as to the constitutionality of Section 2257A.

794 F. Supp. at 417. The district court reasoned that § 2257 was not narrowly tailored because it regulates "all depictions of actual sexually explicit conduct regardless of the age or even the apparent age of the model." *Id.* As to alternative channels for communication, the district court noted that § 2257's substantial burdens would likely chill speech because the penalties for non-compliance are severe, the recordkeeping requirements are burdensome, and performers can no longer remain anonymous and will face stigmatization and ridicule. *Id.* at 418-19.

On appeal, the D.C. Circuit, in a 2-1 decision, affirmed in part and reversed in part the district court's judgment. *Am. Library II*, 33 F.3d at 94. The court determined that § 2257 was content neutral because "it is clear that Congress enacted the Act not to regulate the content of sexually explicit materials, but to protect children by deterring the production and distribution of child pornography." *Id.* at 86.

The D.C. Circuit found that § 2257 satisfied intermediate scrutiny. The court concluded that the government had a significant interest in preventing child pornography and that the statute, which bans no expression, leaves open ample alternative forms of expression. *Id.* at 88. The court also found that § 2257 was narrowly tailored and that it was not overinclusive, rejecting plaintiffs' argument that the statute applies almost entirely to constitutionally protected depictions of adults. *Id.* at 88-90. The court noted that the "entire point of the Act is to prevent subjective determinations of age by implementing a uniform procedure that applies to all performers," and thus, the recordkeeping requirements directly furthered the government's interest. *Id.* at 90.

The D.C. Circuit also addressed a number of other issues raised by plaintiffs. The court found that § 2257's

17

recordkeeping obligations were not onerous and that similar requirements are routinely imposed to "facilitate the enforcement of our immigration, labor, and tax laws." *Id.* at 91. The court further found that plaintiffs were overstating the potential chilling effects associated with eliminating performers' anonymity because the statute and regulations require only that the investigators have access to these records, and thus, performers will not face ridicule and stigmatization from the public at large. *Id.* at 94.

The dissent, however, was primarily concerned that § 2257 was unconstitutionally overbroad. *Id.* at 94-95 (Reynolds, J. dissenting). It noted that the statute regulates depictions protected by the First Amendment and "reaches far beyond depictions which involve or are likely to involve children." *Id.* at 95. Thus, the dissent concluded that § 2257 was overbroad, chilled protected speech, and could not survive First Amendment scrutiny. *Id.*

The Supreme Court denied plaintiffs' petition for certiorari. *Am. Library Ass'n v. Reno*, 515 U.S. 1158 (1995).

(2) *Connection Distributing Co. v. Holder*

In *Connection Distributing Co. v. Holder*, the plaintiff ("Connection"), who publishes a "swingers" magazine, brought an as-applied and facial First Amendment challenge against § 2257. 557 F.3d 321, 326-27 (6th Cir. 2009) ("*Connection*").[7] The district court denied Connection's

---

[7] "Swinging" is a lifestyle that considers monogamy incompatible with human nature, and plaintiffs facilitate swinging by providing a venue for likeminded individuals to share their sexual interests, preferences, and availability. *Connection*, 557 F.3d at 326.

motion for a preliminary injunction. *Id.* at 327. A Sixth Circuit panel affirmed the district court's denial, stating that Connection could not demonstrate a likelihood of success because § 2257 was a content-neutral regulation that most likely satisfied intermediate scrutiny. *Id.* The panel did not address Connection's facial challenge. *Id.*

On remand, the district court granted summary judgment in favor of the government. *Id.* A Sixth Circuit panel reversed and remanded. It directed the district court to permit additional discovery and to reconsider the matter in light of recent Supreme Court precedent, while noting that these intervening decisions by the Supreme Court did not affect its prior holding that § 2257 was content neutral. *See id.* Connection amended its complaint and added additional plaintiffs and claims. *Id.* The district court again denied a motion by plaintiffs for a preliminary injunction and granted the government's motion for summary judgment. *Id.* Plaintiffs appealed. After an initial reversal of the district court, the Sixth Circuit granted rehearing *en banc*.

The Sixth Circuit sitting *en banc*, by an 11-6 decision, held that § 2257 did not violate the First Amendment either as applied to plaintiffs or facially. *Id.* at 328-42.[8] In finding § 2257 constitutional as applied, *id.* at 328-34, the court noted that although § 2257's recordkeeping requirements depend on the content of the images at issue, this did not mean that the law was content based. The court stated that so long as the recordkeeping requirements were "'justified without reference to the content of the regulated speech,'" it could be considered content neutral. *Id.* at 328 (quoting *Ward v. Rock*

---

[8] The court also held that plaintiffs' self-incrimination claim was not ripe because they had yet to assert a privilege. *Connection*, 557 F.3d at 342-43.

*Against Racism*, 491 U.S. 781, 791 (1989)) (other citations omitted). The court found § 2257 to be a content-neutral regulation with only collateral effects on speech because it was enacted "not because of its effect on the audience but because it is the kind of speech that implicates the government's ban on child pornography." *Id.* at 329. The court then applied intermediate scrutiny, finding that: the government had a substantial interest in protecting children from exploitation by pornographers; the statute advances this interest by ensuring that producers confirm performers' ages and by establishing a compliance system; and plaintiffs had ample alternative channels through which they could communicate. *Id.* at 329-30, 332. The court also rejected plaintiffs' argument that § 2257's age-verification requirement was overinclusive because it requires Connection to create and maintain records for performers who are thirty years of age or older. *Id.* at 331. The court reasoned that the government need not employ the least speech-restrictive means of advancing its interest, and that one of Congress's intentions in enacting the statute was to remove subjectivity of age verification. *Id.* Thus, the court concluded that § 2257 satisfied intermediate scrutiny.

The Sixth Circuit also rejected plaintiffs' facial challenge. Plaintiffs argued that § 2257 was overbroad because magazines depicting only "mature adult models" are subject to the statute. *Id.* at 336. The court rejected this argument because plaintiffs failed to introduce evidence demonstrating that such a situation existed, and in any event, plaintiffs did not demonstrate that such overbreadth was substantial because § 2257 complies with the First Amendment in most settings. *Id.* at 336-37.

Plaintiffs further argued that § 2257 was unconstitutionally overbroad because it applied to adult couples who create, but never distribute, a home video or

photograph of themselves engaging in sexually explicit conduct—an issue that was raised for the first time by the district court in its second decision granting summary judgment. *Id.* at 336-37. The government argued that, under the doctrine of constitutional avoidance, § 2257 should be construed as applying only to pornography created for sale or trade, not depictions created by adults for private viewing in their homes. *Id.* at 337-38. The court concluded that § 2257 was not overbroad but did not base its decision on constitutional avoidance. *Id.* Instead, the court found that "[b]ecause the plaintiffs did not raise this theory of unconstitutionality in their complaint or in the district court, the record [was] utterly barren about whether some, many, indeed any, American couples are affected by this proposed application of the statute—and, if so, in what ways." *Id.* at 338. The court further found that there was no evidence that the government ever enforced § 2257 in this setting and that the government asserted that it would not do so in the future. *Id.* at 339. Accordingly, the Sixth Circuit reversed the district court and found that § 2257 was constitutional both as applied and facially.

The dissents, however, asserted that § 2257, *inter alia*, was unconstitutionally overbroad and not narrowly tailored. Judge Kennedy concluded in his dissent that § 2257 was unconstitutionally overbroad because, *inter alia*, the statute applies to—and has a chilling effect on—private couples who produce or wish to produce depictions of their sexually explicit conduct and view those depictions in their homes. *Id.* at 343-61 (Kennedy, J. dissenting). Judge Moore concluded in her dissent that § 2257 was not narrowly tailored because the statute's universal age-verification requirement applies to the old and young alike and the statute regulates depictions of all actual sexually explicit conduct, not just those depicting

what Congress ultimately sought to prevent. *Id.* at 361-67 (Moore, J. dissenting).

## B. PLAINTIFFS' FIRST AMENDMENT CLAIM

### (1) AS-APPLIED CHALLENGE

Plaintiffs argue that the Statutes are content based, that strict scrutiny must therefore be applied, and that the Statutes cannot satisfy strict scrutiny. In the alternative, Plaintiffs argue that even if the Statutes are content neutral, the Statutes cannot satisfy intermediate scrutiny. As discussed *infra*, the District Court did not err in determining that the Statutes were content neutral and that intermediate scrutiny is applicable. However, we will vacate the District Court's dismissal of Plaintiffs' as-applied First Amendment claim because Plaintiffs should be afforded the opportunity to conduct discovery and develop the record regarding whether the Statutes are narrowly tailored.

### (a) THE STATUTES ARE CONTENT NEUTRAL

When determining whether a statute is content neutral, a principal consideration is "whether the government has adopted a regulation of speech because of disagreement with the message it conveys," or instead, adopted that regulation for some other purpose collateral to the protected speech. *Ward*, 491 U.S. at 791. In other words, "the government's purpose is the controlling consideration," and "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward,* 491 U.S. at 791-92 (finding that sound-amplification regulations were content neutral because they sought to avoid undue intrusion into residential areas, not suppress free expression); *see also Hill v. Colorado*, 530 U.S. 703, 719-20 (2000) (finding that a

statute creating buffer zones near health facilities was content neutral because it was enacted, *inter alia*, to protect patients' privacy, not because of any disagreement with the speakers' messages); *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47-48 (1986) (finding that a zoning regulation for adult movie theaters was content neutral because it was promulgated to prevent crime and maintain property values, not to suppress the expression of unpopular speech).

The Courts of Appeals that have considered the constitutionality of § 2257 have concluded that it is content neutral. In *Connection*, the Sixth Circuit stated that

> Congress's unanimous concern in enacting [§ 2257] was to deter the production and distribution of child pornography. Congress singled out these types of pornography for regulation not because of their effect on audiences but because doing so was the only way to ensure that its existing ban on child pornography could be meaningfully enforced.

> \* \* \*

> No doubt, § 2257 favors a particular viewpoint on this issue: Congress is against child pornography and is using this law to prevent it. Although that kind of viewpoint discrimination normally would be fatal to a law, that is not true here because the Constitution allows the government to embrace this viewpoint and to act on it . . . .

*Connection*, 557 F.3d at 328-29.[9] The Sixth Circuit concluded that § 2257 was content neutral because the statute has a "valid speech-related end—eliminating child pornography—followed by a means of achieving that end, a proof-of-age requirement that refers to the content of the speech . . . not because of its effect on the audience but because it is the kind of speech that implicates the government's ban on child pornography." *Id.* at 329.

Similarly, the D.C. Circuit in *American Library Association II* found that "Congress enacted [§ 2257] not to regulate the content of sexually explicit materials, but to protect children by deterring the production and distribution of child pornography." 33 F.3d at 86.

We agree with the Sixth and D.C. Circuits that the Statutes are content neutral.[10] Congress enacted the Statutes for the purpose of protecting children from exploitation by pornographers. Congress singled out the types of depictions covered by the Statutes not because of their effect on audiences or any disagreement with their underlying message but because doing so was the only pragmatic way to enforce its ban on child pornography. Any impact by the Statutes on

---

[9] It is long-settled that child pornography depicting actual children is not protected under the First Amendment. *New York v. Ferber*, 458 U.S. 747, 764 (1982); *see also United States v. Hotaling*, 634 F.3d 725, 728 (2d Cir. 2011); *United States v. Moreland*, 665 F.3d 137, 140 (5th Cir. 2011).

[10] Although *Connection* and *American Library Association* address only § 2257, not § 2257A, we are satisfied that their analysis applies with equal force to § 2257A, and the parties have not argued otherwise.

Plaintiffs' protected speech is collateral to the Statutes' purpose of protecting children from pornographers.

Plaintiffs' arguments that the Statutes are content based are unavailing. Plaintiffs concede that the government's purpose in enacting the Statutes is the controlling inquiry. Plaintiffs, nevertheless, argue that the Statutes are content based because they do not serve purposes unrelated to the content of the speech that they seek to regulate. Plaintiffs, however, are conflating protected speech and unprotected speech. The Statutes serve purposes unrelated to the content of Plaintiffs' protected speech—namely the protection of children against sexual exploitation and the elimination of child pornography. That a statute refers to the content of Plaintiffs' protected expression does not necessarily render it content based. *See, e.g.*, *Renton*, 475 U.S. at 47 (finding that a zoning regulation was content neutral even though it treated adult movie theaters differently from other types of theaters based on the content of the films exhibited); *see also Connection*, 557 F.3d 328 (citing *Ward*, 491 U.S. at 791) (concluding that § 2257 was content neutral even though it did not "entirely ignore the content of the producers' images").

To demonstrate that a restriction is content based and thus subject to strict scrutiny, Plaintiffs must show that the Statutes single out speech for special treatment because of the effect that speech will have on its audience. *See United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 811-12 (2000) (finding the essence of content-based regulations are those that focus on the content of the speech and the direct impact that speech has on listeners); *see also Boos v. Barry*, 485 U.S. 312, 322 (1988) (holding that a statute is content based where its justification "focuses only on the content of the speech and the direct impact that speech has on its listeners") (emphasis omitted); *Connection*, 557 F.3d at 328.

25

Plaintiffs have not demonstrated that Congress enacted the Statutes because of the effects their speech will have on the audience.[11] Accordingly, we conclude that the Statutes are content neutral.

---

[11] Plaintiffs further point to the § 2257A(h)(1) commercial certification exception to support their argument that the Statutes are content based. Plaintiffs reason that, under this exception, depictions of *simulated* sexually explicit conduct may be exempted from the Statutes, but that no such exemption is provided for depictions of *actual* sexually explicit conduct generally. Plaintiffs conclude that this distinction is based solely on the content of the expression at issue. However, the commercial certification exception—though it is defined in part by the content of the depiction being produced—was not enacted solely because of any disagreement with the message conveyed by that content. Instead, Congress provided this exception for those producers that it believed were subject to other regulatory schemes that adequately achieve the same age-verification ends as the Statutes. As Senator Patrick Leahy explained, the commercial certification exception was necessary because certain commercial industries, including the motion picture industry, "currently operate[] under a panoply of laws, both civil and criminal, as well as regulations and labor agreements governing the employment of children in any production," and thus burdening these producers would not substantially further Congress's intent of protecting children. 152 Cong. Rec. S8012-02, S8027 (July 20, 2006). Consequently, Plaintiffs' reliance on § 2257A(h)(1) is misplaced.

(b)     THE INTERMEDIATE
SCRUTINY ANALYSIS

We apply intermediate scrutiny to content-neutral regulations challenged on First Amendment grounds. *See Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2723 (2010); *Conchatta Inc. v. Miller*, 458 F.3d 258, 267 (3d Cir. 2006). A statute satisfies intermediate scrutiny where it: (1) advances a "substantial" governmental interest; (2) does not "burden substantially more speech than is necessary" (i.e., the statute must be narrowly tailored); and (3) leaves open "ample alternative channels for communication." *Ward*, 491 U.S. at 791, 798-800. A statute may satisfy intermediate scrutiny even though it is not the "least restrictive or least intrusive" means of furthering the government's substantial interest. *Ward*, 491 U.S. at 798.

The Statutes clearly advance a substantial governmental interest—protecting children from sexual exploitation by pornographers. The Statutes combat child pornography in at least four specific ways: (1) they ensure that primary producers of sexually explicit expression confirm the ages of their performers prior to filming; (2) they permit secondary producers that publish the depictions to verify that the performers were not children; (3) they prevent children from passing themselves off as adults; and (4) they aid law enforcement and eliminate subjective disputes with producers over whether the producer should have verified the age of a particular performer. *See Connection*, 557 F.3d at 329-30.

Plaintiffs concede that protecting children from exploitation by pornographers is an "important, indeed compelling, governmental interest." Pls.' Br. at 24. However, Plaintiffs argue that the government failed to demonstrate that the Statutes advance that particular interest

27

or that the problems identified are real, not conjectural. *Id.* 24-25. We are not persuaded. Both the Report and Congress's findings related to the 2006 Act expressed that an extensive interstate market for child pornography continued to exist and that children were still at risk for sexual exploitation by pornographers. Report at 608-09; 2006 Act § 501(1)(B). The Report further determined that the pornography industry's practice of employing youthful-looking performers made it nearly impossible for law enforcement officers to effectively investigate potential child pornography. Report at 618. The Report recommended that, to remedy these problems, Congress impose recordkeeping and labeling requirements similar to those Congress ultimately adopted in the Statutes.[12] Consequently, the

---

[12] The concurrence similarly asserts that the government has not demonstrated that the Statutes advance the government's interest of protecting children in a direct and effective way. We disagree. Notably, the other Circuits that have considered the constitutionality of § 2257 have determined that it advances the aforementioned interest. *See, e.g.*, *Am. Library II*, 33 F.3d at 88 ("[I]t seems obvious to us that, as a general matter, the requirements of section 2257 advance the abatement of child pornography in fundamental ways."); *Connection*, 557 F.3d at 329-30. At a minimum, the Statutes' requirement that producers review each performer's identification directly and effectively prevents minors from passing themselves off as adults.

District Court did not err in concluding that the government adequately demonstrated that the Statutes advance the substantial interest of protecting children.[13]

Nonetheless, we will vacate the District Court's dismissal of Plaintiffs' as-applied First Amendment claim (Count 1) and remand it for further proceedings because Plaintiffs should be afforded the opportunity to conduct discovery and develop the record regarding whether the Statutes are narrowly tailored. Narrow tailoring is satisfied where the statute at issue does not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 799. Thus, the issue before us is whether the Statutes burden substantially more of Plaintiffs' speech than is necessary to further the government's legitimate interest of protecting children. This question is particularly difficult here because we are reviewing a motion to dismiss and have before us only the

Moreover, we are not persuaded by the concurrence's position that if a statute could be unlawfully circumvented (e.g., by falsifying records or operating underground), then it may not advance the government's interest. We are aware of no authority that supports such a proposition. Many statutes, including those banning the production and possession of child pornography, are regularly violated. Nonetheless, these statutes, like §§ 2257 and 2257A, still advance the government's interest of protecting children in a direct and effective way.

[13] The District Court also did not err in concluding that the Statutes leave open ample alternative channels for communication. The Statutes regulate recordkeeping and labeling procedures and do not ban or otherwise limit speech. Plaintiffs have not argued otherwise.

allegations and exhibits in the complaint, orders issued in the action, and other matters of public record. *See, e.g.*, *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (listing the types of documents courts may consider on motions to dismiss).[14]

Construing the complaint in a light most favorable to Plaintiffs—our task on a motion to dismiss, *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008)—we are confronted with allegations that the Statutes are not narrowly tailored and fail intermediate scrutiny because they "unconstitutionally restrict and burden a vast amount of constitutionally protected expression that Plaintiffs produce," including depictions of "adults engaged in simulated or actual sexually explicit conduct." *See* Plaintiffs' Complaint, Dkt. # 1 at ¶ 51. Plaintiffs, of course, are required only to make a "short and plain statement of the claim" under Fed. R. Civ. P. 8, and the government does not challenge the factual sufficiency of Plaintiffs' First Amendment claim.

The government asserts that the Statutes are narrowly tailored because uniform recordkeeping and labeling procedures are necessary for producers regardless of the actual or apparent ages of the performers. According to the government, a uniform rule is necessary because sexually explicit images of adults often cannot be distinguished from images showing minors and such a rule eliminates subjectivity as to which performers' ages must be verified. This argument, however, is in the abstract and may not necessarily apply to all Plaintiffs. For example, if one of the Plaintiffs employs performers that no reasonable person could conclude were minors, then that plaintiff may be able to demonstrate that the Statutes burden substantially more of

---

[14] Neither *Connection* nor *American Library Association* was decided on a motion to dismiss.

that plaintiff's speech than is necessary to protect children from sexual exploitation. *See, e.g.*, *Am. Library II*, 33 F.3d at 90 (observing that some applications of the statute, such as to "an illustrated sex manual for the elderly" may be unconstitutional). On the other hand, if any of the Plaintiffs produces depictions of predominantly youthful-looking performers, then the Statutes may be narrowly tailored as to those Plaintiffs. In sum, on this record, we cannot accurately compare the amount of Plaintiffs' constitutionally-protected speech that does not implicate the government's interest in protecting children (e.g., speech involving performers who are obviously adults) to the amount of Plaintiffs' speech that implicates the government's interest (e.g., speech involving performers who are not obviously adults). This comparison is essential to our narrow tailoring analysis, and Plaintiffs must be afforded the opportunity to conduct discovery and develop a record supporting their claim that the Statutes burden substantially more speech than is necessary.

Accordingly, we will vacate the District Court's order insofar as it dismisses Plaintiffs' as-applied First Amendment claim (Count 1) and remand the claim for further proceedings.

### (2)   FACIAL CHALLENGE

Under the First Amendment overbreadth doctrine, a party may bring a facial challenge against a statute, even though it is not unconstitutional as applied to that particular party, because "the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973); *see also Members of the City Council of the City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 798-99 (1984); *Borden v. Sch. Dist. of the Twp. of E. Brunswick*, 523 F.3d 153, 165 (3d Cir. 2008). Declaring a statute

unconstitutional on overbreadth grounds is "strong medicine" and should be used "sparingly and only as a last resort." *Broadrick*, 413 U.S. at 613. Consequently, "a single impermissible application" cannot invalidate a statute. *Ferber*, 458 U.S. at 772. Instead, a law may be invalidated as overbroad only if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449, n.6 (2008); *see also United States v. Stevens*, 130 S. Ct. 1577, 1587 (2010); *Ferber*, 458 U.S. at 770; *Broadrick*, 413 U.S. at 615. Because "[t]he concept of 'substantial overbreadth' is not readily reduced to an exact definition," *Vincent*, 466 U.S. at 800, the challenge is in determining at what point the invalid applications of the statute become substantial compared to the valid applications. When making such a determination, we consider four factors: (1) "the number of valid applications" of the statute; (2) "the historic or likely frequency of conceivably impermissible applications"; (3) "the nature of the activity or conduct sought to be regulated"; and (4) "the nature of the state interest underlying the regulation." *Gibson v. Mayor and Council of the City of Wilmington*, 355 F.3d 215, 226 (3d Cir. 2004) (citations and quotation marks omitted); *see also Borden*, 523 F.3d at 165. Thus, a significant consideration in overbreadth analyses is the likelihood and frequency of invalid applications of the statute compared to valid applications. *See, e.g.*, *Gibson*, 355 F.3d at 228.

We conclude that the District Court erred in dismissing Plaintiffs' First Amendment facial claim (Count 1). As stated *supra*, Congress enacted the Statutes to protect children from sexual exploitation. The Statutes, though, apply to more than those producers who sexually exploit children. They mandate compliance by "[w]hoever produces" sexually explicit

depictions regardless of the performers' actual or apparent ages. *See, e.g.*, 18 U.S.C. §§ 2257(a), 2257A(a). Plaintiffs assert that a "vast quantity" of protected sexually explicit depictions include performers who are "clearly mature adults" that "could not be mistaken for children." Pls.' Br. at 41. The degree of the asserted overbreadth is obviously the critical determination, but Plaintiffs were never afforded the opportunity to conduct discovery or develop a record from which we could determine this degree. Without some notion of both the amount of speech that implicates the government's interest in protecting children (e.g., depictions of performers who reasonably could be minors based on their apparent ages) and the amount of speech that is burdened but does not further the government's interest (e.g., depictions of performers who are obviously adults), we cannot intelligently weigh the legitimate versus problematic applications of the Statutes.

Moreover, Plaintiffs should be permitted to develop the record as to whether the Statutes are unconstitutionally overbroad based on their purported regulation of purely private conduct. Plaintiffs assert that the Statutes are substantially overbroad because they burden the entire universe of constitutionally protected expression involving sexually oriented images of adults—including private, noncommercial depictions created and viewed by adults in their homes.

The government counters that, under the doctrine of constitutional avoidance, the Statutes' scope should be narrowly construed as applying only to depictions of actual or simulated sexually explicit conduct *created for sale or trade*, and thus, producers of purely private depictions would not be subject to the Statutes. In support of this position, the government cites the preamble to the regulations, which states that the government interprets the Statutes as being "limited

to pornography intended for sale or trade." 73 Fed. Reg. at 77,456. The government also points to specific terms in § 2257 that it asserts speak primarily to the creation of images for industry distribution, such as "sexual performers," "places of business," and "normal business hours."

We conclude that the Statutes are not susceptible to such a limiting construction. Although we are mindful that facial overbreadth is not to be invoked where a "limiting construction has been or could be placed on the challenged statute," *Broadrick*, 413 U.S. at 613, such limiting constructions are available only if the statute is "readily susceptible to such a construction." *Stevens*, 130 S. Ct. at 1592 (citations and quotation marks omitted).[15] Thus,

---

[15] The government asserts that *Stevens* is inapposite to the instant matter. In *Stevens*, the government argued that a statute prohibiting depictions of "animal cruelty" was not overbroad because it could be construed as prohibiting only "extreme" cruelty and the government has not prosecuted for anything less than extreme cruelty. *See, e.g.*, *Stevens*, 130 S. Ct. at 1582, 1591. The Supreme Court rejected this argument, stating that "the First Amendment protects against the Government" and "does not leave us at the mercy of *noblesse oblige*." *Id.* The government argues that the instant matter is distinguishable because the government promulgated its limiting interpretation of the Statutes in the regulations and is not relying on mere prosecutorial discretion as in *Stevens*.

We disagree and interpret *Stevens* as concluding that a promise by the government that it will interpret statutory language in a narrow, constitutional manner cannot, without more, save a potentially unconstitutionally overbroad statute. *See, e.g.*, *Stevens*, 130 S. Ct. at 1591 ("We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly."). The manner in which the

limiting constructions are not available where they require "rewriting, not just reinterpretation" of the statute. *Id.* Here, the plain language of the Statutes makes clear that they apply broadly to all producers of actual or simulated sexually explicit depictions regardless of whether those depictions were created for the purpose of sale or trade. *See, e.g.*, 18 U.S.C. §§ 2257(a) and 2257A(a) (stating generally that "[w]hoever produces" any book or other matter containing "visual depictions" of actual or simulated "sexually explicit conduct" shall be subject to the Statutes). It is axiomatic that regulations cannot supersede a federal statute. *In re Complaint of Nautilus Motor Tanker Co.*, 85 F.3d 105, 111 (3d Cir. 1996). As a result, the plain text of the Statutes setting forth their broad scope must trump any conflicting statements contained within the preamble to the regulations, including the assertion that the Statutes are "limited to pornography intended for sale or trade." 73 Fed. Reg. at 77,456.

The government's position is further belied by the § 2257A(h) commercial certification exception. This exception expressly applies only to depictions "intended for

government made such a promise—e.g., prosecutorial discretion as opposed to a regulatory pronouncement—is not, in our opinion, dispositive. After all, there is no guarantee that the government's current interpretation of the Statutes will remain unchanged. The government's interpretation that the Statutes are "limited to pornography intended for sale or trade," was made in the preamble to the regulations. *See, e.g.*, 73 Fed. Reg. at 77,456. Limiting statements in regulatory preambles, like assurances of prosecutorial discretion, may one day be modified by the executive branch to permit the exercise of the Statutes' full authority, which is the very concern at the heart of *Stevens*.

commercial distribution" or those "created as part of a commercial enterprise."  18 U.S.C. § 2257A(h)(1)(A)(i) and (h)(1)(B)(ii).  If the Statutes were intended to apply only to depictions meant for industry distribution, as the government asserts, then § 2257A(h)'s requirement that the depictions be produced for commercial distribution would be surplusage. *See, e.g.*, *Tavarez v. Klingensmith*, 372 F.3d 188, 190 (3d Cir. 2004) (stating that where possible, courts are to give effect to every clause and word of a statute and be reluctant to treat statutory terms as mere surplusage).

Similarly, the regulations' definition of "producer" also belies the government's position.  As discussed *supra*, the regulations define "producer" as a primary or secondary producer.  28 C.R.R. § 75.1(c).  A primary producer is defined as any person who creates a visual depiction of a human being engaged in actual or simulated sexually explicit conduct.  *Id.* at (c)(1).  The definition of a primary producer is silent as to whether the depiction must be intended for commercial distribution.  *Id.*  A secondary producer, however, is defined as any person who, *inter alia*, publishes a magazine or other matter containing a visual depiction of a human being engaged in actual or simulated sexually explicit conduct, which is "*intended for commercial distribution*."  *Id.* at (c)(2) (emphasis added).  Thus, because the definition of "secondary producer" limits its scope to those depictions created for commercial distribution but the definition of "primary producer" does not, the clear implication is that

36

"primary producer" is not limited to those who create depictions for commercial distribution.[16]

Accordingly, we will vacate the District Court's order dismissing Plaintiffs' facial challenge brought pursuant to their First Amendment claim (Count 1) and remand this claim for further proceedings.

### (3) COLLATERAL ESTOPPEL

In June 2005, FSC and Conners—in addition to others—brought an action in the District of Colorado captioned *Free Speech Coalition, Inc. et al. v. Gonzales*, No. 1:05-cv-01126-WDM-BNB. This action challenged the constitutionality of § 2257 on various grounds.

The District of Colorado granted partial summary judgment for the government. *Free Speech Coal. v. Gonzales*, 483 F. Supp. 2d 1069, 1076 (D. Colo. 2007) ("*FSC II*"). As to FSC and Conners' First Amendment claims, the District of Colorado found that intermediate scrutiny was appropriate because § 2257 and its regulations do not impose a prior restraint on speech and are content neutral. *Id.* at 1076. The District of Colorado also held that, with two

---

[16] We are also not persuaded by the government's argument—at least at this point—that the amount of purely private conduct is "not only unknown but most likely unknowable because it involves the private sexual activity of Americans in their homes." Def.'s Br. at 54. Attempting to ascertain the unknown is an essential aspect of our discovery process. It is, therefore, generally preferable to permit the parties to conduct discovery before concluding that something is unknowable.

exceptions,[17] § 2257 and its regulations satisfied intermediate scrutiny with respect to the First Amendment, and that the statute was not impermissibly vague or overbroad. *Id.*[18]

Subsequent to the District of Colorado's order on summary judgment in *FSC II*, the plaintiffs, including FSC and Conners, moved to alter or amend the court's grant of partial summary judgment pursuant to Fed. R. Civ. P. 59 because, *inter alia*, "the facts of the case [had] drastically changed since the government's [summary judgment motion]

---

[17] The District of Colorado found that the government did not move for summary judgment with respect to two aspects of the plaintiffs' First Amendment claims. These were: (1) a regulation requiring that plaintiffs maintain a copy of depictions from live Internet chat rooms; and (2) a regulation requiring that plaintiffs maintain a copy of any URL associated with a depiction published on the Internet regardless of whether the producer has control over the website which posts the depiction. *Compare FSC II*, 483 F. Supp. 2d at 1076 & n.4 (stating that the government did not move for summary judgment with respect to the two exceptions noted in the court's previous order) *with Free Speech Coal. v. Gonzales*, 406 F. Supp. 2d 1196, 1208-10 (D. Colo. 2005) (describing the two issues in detail).

[18] The District of Colorado further dismissed the plaintiffs' claim that § 2257 violated the Fifth Amendment's Self-Incrimination Clause because the regulations require producers to maintain records only for inspection purposes and plaintiffs failed to produce any evidence that they were ever subjected to an inspection. *FSC II*, 483 F. Supp. 2d at 1080-81. The District of Colorado also dismissed plaintiffs' Fourth Amendment claim because plaintiffs failed to oppose the government's motion as to this claim. *Id.* at 1081.

and Free Speech Coalition's response was filed." *Free Speech Coal., Inc. v. Gonzales*, 1:05-cv-01126-WDM-BNB, Dkt. # 112. FSC and Conners concluded that the District of Colorado should "reopen the case to allow the parties to submit additional evidence on the applicability of intermediate scrutiny to various aspects [of] the § 2257 record-keeping scheme." *Id.* While the motion to amend was pending, plaintiffs—including FSC and Conners—moved for dismissal of the case without prejudice pursuant to Fed. R. Civ. P. 41(a)(2). *Id.* at Dkt. # 143. The government did not oppose plaintiffs' motion for dismissal, and the District of Colorado granted the motion, dismissing the complaint without prejudice. *Id.*

In the instant matter, the District Court, relying on *FSC II*, found that FSC and Conners were collaterally estopped from maintaining their First Amendment challenge to § 2257.[19] We disagree.

A plaintiff is generally precluded from reasserting the same issue that was subject to a final judgment during a previous adjudication. *See In re Brown*, 951 F.2d 564, 569 (3d Cir. 1991). There is no bright-line rule regarding what constitutes a "final judgment" for issue preclusion. Instead, we have found that a prior adjudication of an issue in another action must be "sufficiently firm" to be accorded conclusive effect. *Id.* (citing Restatement (Second) of Judgments § 13 (1982)). We have stated that "'[f]inality for purposes of issue preclusion is a more 'pliant' concept than it would be in other contexts,'" and that finality "'may mean little more than that

---

[19] This alternative holding did not affect the claims by FSC and Conners regarding § 2257A or their claims challenging the constitutionality of § 2257 on grounds other than the First Amendment.

the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again.'" *Id.* (quoting *Dyndul v. Dyndul*, 620 F.2d 409, 412 (3d Cir. 1980)). Factors that courts consider when determining whether the prior determination was sufficiently firm include: "whether the parties were fully heard, whether a reasoned opinion was filed, and whether that decision could have been, or actually was, appealed." *Id.* None of these factors appears to be determinative.

Although we find this to be a close call, we are not persuaded that *FSC II* was sufficiently firm to be afforded preclusive effect under the circumstances. Subsequent to the District of Colorado's order, FSC and Conners remained as parties in the action and continued to maintain certain challenges to § 2257 on First Amendment grounds. The District of Colorado never issued a final judgment with respect to all claims brought by FSC and Conners, and thus, its order granting partial summary judgment was never appealable. Moreover, a motion to amend that order was pending before the District of Colorado at the time that the court dismissed the complaint without prejudice. The government neither requested a resolution of the motion to amend the order nor objected to the motion to dismiss the complaint without prejudice. The government has not asserted—and there is nothing in the record to indicate—that FSC and Conners are either forum shopping or otherwise committing an abuse of process.

Accordingly, we will vacate the District Court's order to the extent that it dismissed the First Amendment claim by FSC and Conners based on collateral estoppel.

### C.    PLAINTIFFS' FOURTH AMENDMENT CLAIM

The Statutes require that producers make their individually identifiable records of the visual depictions "available to the Attorney General for inspection at all reasonable times." 18 U.S.C. §§ 2257(c) and 2257A(c). The regulations implementing the Statutes authorize investigators, at any reasonable time and without delay or advance notice, to enter any premises where a producer maintains its records to determine compliance with the recordkeeping requirements or other provisions of the Statutes. 28 C.F.R. § 75.5(a) and (b). Producers must make these records available for inspection for at least twenty hours per week, and the records may be inspected only once during any four-month period unless there is reasonable suspicion to believe that a violation has occurred. *Id.* § 75.5(c)(1) and (d).

Plaintiffs brought an as-applied and facial Fourth Amendment claim (Count 4), alleging that the Statutes and regulations unreasonably authorize the government to conduct warrantless searches and seizures. Plaintiffs also sought leave to amend their Fourth Amendment claim and include an allegation that FSC and others were subjected to

inspections pursuant to § 2257.[20]   The District Court dismissed Plaintiffs' Fourth Amendment claim, holding that Plaintiffs had no objective expectation of privacy in the records, and that in any event, the government's searches were permissible under the administrative search exception to

---

[20] Plaintiffs sought leave to amend their complaint to include the following:

> Several of Free Speech Coalition's members have been subjected to inspections pursuant to 18 U.S.C. § 2257 and its implementing regulations.  In each instance, a team of FBI agents came to the member's private business premises, without a warrant or prior notice, gained access under authority of 18 U.S.C. § 2257 and its implementing regulations, entered areas of the business premises not open to the public, searched through the business's files and records owned and possessed by the member pertaining to its sexually explicit expression and made copies of certain records.  The agents also took photos of the interior areas of the business premises-again, all without a warrant. Inspections have also been made by FBI agents of producers who are not members of Plaintiff Free Speech Coalition, and in two instances, upon information and belief, inspections were conducted at private residences of the producers because that is where their records were maintained.

*See* Plaintiffs' Motion for Leave to Amend Complaint with Brief in Support, Dkt. # 49 at 4.

the Fourth Amendment. The District Court further denied Plaintiffs motion to amend as futile.[21] We will vacate the District Court's order with respect to Plaintiffs claims under the Fourth Amendment, and remand for development of the record. In particular, remand will permit the District Court to consider the impact, if any, of the recent Supreme Court decision in *United States v. Jones*, 132 S. Ct. 945 (2012).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures." U.S. Const. amend. IV. "If the search is reasonable, there is no constitutional problem, for the Fourth Amendment only protects individuals from unreasonable searches and seizures." *United States v. Sczubelek*, 402 F.3d 175, 182 (3d Cir. 2005). It is well settled that the Fourth Amendment's scope extends beyond criminal investigations and protects against certain arbitrary and invasive acts by the government. *See, e.g.*, *City of Ontario v. Quon*, 130 S. Ct. 2619, 2627 (2010).

There are two ways in which the government's conduct may constitute a "search" implicating the Fourth Amendment. First, a Fourth Amendment search occurs when "the person invoking its protection can claim a justifiable, a reasonable, or a legitimate expectation of privacy that has been invaded by government action." *Smith v. Maryland*, 442 U.S. 735, 740 (1979) (citations and quotation marks omitted); *see also Kyllo v. United States*, 533 U.S. 27, 32-33 (2001) ("[A] Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society

---

[21] According to the District Court, the amendment would neither remedy Plaintiffs' lack of an expectation of privacy in the records nor overcome the administrative search exception.

recognizes as reasonable."); *Katz v. United States*, 389 U.S. 347, 353 (1967) ("The Government's activities in electronically listening to and recording the petitioner's words violated the privacy upon which he justifiably relied . . . and thus constituted a 'search and seizure' within the meaning of the Fourth Amendment."). Determining whether one's expectation of privacy is justifiable involves two separate inquiries: (1) whether the individual demonstrated an actual or subjective expectation of privacy in the subject of the search or seizure; and (2) whether this expectation of privacy is objectively justifiable under the circumstances. *Smith*, 442 U.S. at 740 (quotation marks omitted); *Katz*, 389 U.S. at 361 (Harlan, J., concurring); *United States v. Ferri*, 778 F.2d 985, 994 (3d Cir. 1985).

Second, as the Supreme Court's recent decision in *Jones* makes clear, a Fourth Amendment search also occurs where the government unlawfully, physically occupies private property for the purpose of obtaining information. *See* 132 S. Ct. at 949-52 (stating that the reasonable-expectation-of-privacy test set forth in *Katz* was "*added to*, not *substituted for*, the common-law trespassory test") (emphasis in original). Under this analysis, we must determine whether the government committed common-law trespass when obtaining the information. *See Jones*, 132 S. Ct. at 949-52; *see also Rakas v. Illinois*, 439 U.S. 128, 143 (1978) (explaining the common-law-trespass test employed prior to *Katz*). If such a trespass occurs, then the government's actions constitute a search implicating the Fourth Amendment. *See Jones*, 132 S. Ct. at 949-52.

Here, the District Court erred in dismissing Plaintiffs' Fourth Amendment claim, as sought to be amended. Courts generally must consider the concrete factual context when determining the constitutional validity of a warrantless search. *See Sibron v. New York*, 392 U.S. 40, 59 (1968)

(declining to hold whether a particular statute was facially invalid under the Fourth Amendment because the "constitutional validity of a warrantless search is pre-eminently the sort of question which can only be decided in the concrete factual context of the individual case"); *United States ex rel. McArthur v. Rundle*, 402 F.2d 701, 704-05 (3d Cir. 1968) (stating that in the case of warrantless searches, courts are required to consider the concrete factual context); *see also United States v. $291,828.00 in United States Currency*, 536 F.3d 1234, 1238 (11th Cir. 2008). Plaintiffs' complaint, as amended, would allege that government officials searched and/or seized without a warrant—and in violation of the Fourth Amendment—the premises and effects of certain FSC members and others. The record, however, is not clear as to: which specific members of FSC were searched; when and where the searches of the FSC members and others occurred (i.e., offices or homes); and the conduct of the government during the search (e.g., what specific information the government reviewed and whether the government exceeded its authority under the applicable regulations).[22]

This factual context is necessary for determining whether the government's conduct was a "search" under the Fourth Amendment pursuant to either the reasonable-expectation-of-privacy test set forth in *Katz* or the common-law-trespass test described in *Jones*. As to the *Katz* analysis, we cannot conclude on this record whether plaintiffs have an objective expectation of privacy in the searched areas and effects unless the contours of the alleged searches are more

---

[22] The government argues that Plaintiffs' as-applied Fourth Amendment claim is legally groundless, but does not assert that this claim—as potentially amended—is factually insufficient. *See* Def.'s Br. at 60-69.

fully delineated. Likewise, an analysis under *Jones* would benefit from a more developed record because the court must conclude whether a common-law trespass occurred during any of the alleged searches, which is traditionally a fact-intensive inquiry.

Moreover, further development of the record is necessary to determine whether the administrative search exception to the expectation-of-privacy test is applicable. An owner or operator of a business may have an expectation of privacy in commercial property that society is prepared to consider reasonable. *See New York v. Burger*, 482 U.S. 691, 699 (1987); *Katz*, 389 U.S. at 361 (Harlan, J., concurring). Such an expectation "exists . . . with respect to administrative inspections designed to enforce regulatory statutes." *Burger*, 482 U.S. at 700; *see also Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312-13 (1978). This expectation, however, is "different from, and indeed less than, a similar expectation in an individual's home," and it is "particularly attenuated in commercial property employed in 'closely regulated' industries." *Burger*, 482 U.S. at 700. Certain industries have such a history of government oversight that no reasonable expectation of privacy could exist. *See Marshall*, 436 U.S. at 313; *Burger*, 482 U.S. at 700. Factors to consider when determining whether a particular industry is closely regulated include: duration of the regulation's existence, pervasiveness of the regulatory scheme, and regularity of the regulation's application. *See Donovan v. Dewey*, 452 U.S. 594, 605-06 (1981).

Once a business is determined to be part of a closely regulated industry, then we must decide whether the alleged warrantless search was reasonable. *See Burger*, 482 U.S. at 702. Warrantless searches of closely regulated businesses are reasonable where the following criteria are met: (1) the regulatory scheme furthers a substantial government interest;

(2) the warrantless inspections are necessary to further the regulatory scheme; and (3) the inspection program, in terms of certainty and regularity of its application, is a constitutionally adequate substitute for a warrant. *Burger*, 482 U.S. at 702-03.

We cannot determine the applicability of the administrative search exception based on the record before us. The nature and manner of the search are critical factors when determining both whether an industry is closely regulated and the reasonableness of the particular search. For example, the record is unclear as to: the frequency and extensiveness of the alleged searches; whether the alleged searches occurred exclusively on commercial premises; and whether the Plaintiffs who were subjected to the alleged searches were engaged in commercial activities within a particular industry. Thus, further development of the record is necessary.[23]

As a result of the foregoing, Plaintiffs' motion for leave to amend their Fourth Amendment claim should be granted. Leave to amend should be freely given when justice so requires, including for a curative amendment unless such an amendment would be inequitable or futile. *See Toll Bros.,*

---

[23] We cannot agree with the concurrence's assertion that, at this time, we should conclude there is "no set of facts" that could justify the application of the administrative search exception. This matter is before us on a motion to dismiss under Rule 12(b)(6). The government has yet to file a responsive pleading, and the parties have not begun the discovery process. As discussed *supra*, the parties must be allowed to develop the factual contours of their Fourth Amendment claims and defenses. Accordingly, we will not prejudge the validity of any claim or defense prior to the creation of that record.

*Inc. v. Twp. of Readington*, 555 F.3d 131, 144 n.10 (3d Cir. 2009). Plaintiffs' proposed amendment is not futile because, as discussed *supra*, their Fourth Amendment claim, with the proposed amendment, would withstand a motion to dismiss. *See, e.g.*, *Centifanti v. Nix*, 865 F.2d 1422, 1431 (3d Cir. 1989). Also, granting leave to amend is not inequitable because, *inter alia*, the pleadings were not closed and the government has not asserted any substantial prejudice.

Accordingly, we will vacate the District Court's order dismissing Plaintiffs' Fourth Amendment claim (Count 4) and denying Plaintiffs leave to amend their Fourth Amendment claim. We will remand this claim for further proceedings.

D. ADDITIONAL CLAIMS

It is well settled that appellants must "set forth the issues raised on appeal and to present an argument in support of those issues in their opening brief." *Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir. 1993). "[I]f an appellant fails to comply with these requirements on a particular issue, the appellant normally has abandoned and waived that issue on appeal and it need not be addressed by the court of appeals." *Id.*

Here, Plaintiffs listed additional claims that they argued before the District Court, including that the Statutes: unconstitutionally suppressed anonymous speech; imposed a prior restraint on protected expression; unconstitutionally imposed strict liability for failing to create and maintain the requisite records; violated equal protection of the laws; were unconstitutionally vague; and violated the privilege against self-incrimination. Pls.' Br. at 58-59. Plaintiffs did not include any argument with respect to these claims or otherwise explain how the District Court erred in dismissing them. Accordingly, we conclude that Plaintiffs abandoned

48

any issues with respect to these claims, and we will affirm the District Court's dismissal of them.

## III. CONCLUSION

For the reasons set forth above, we will vacate the District Court's order to the extent that it: dismissed in their entirety Plaintiffs' claims brought pursuant to the First Amendment (Count 1) and the Fourth Amendment (Count 4); dismissed Plaintiffs' claim for injunctive relief (Count 6) to the extent that it asserts a right to injunctive relief for violations of the First Amendment or the Fourth Amendment; and denied Plaintiffs leave to amend their Fourth Amendment claim (Count 4). We will affirm the District Court's order in all other respects and remand the case for further proceedings consistent with the foregoing opinion.

RENDELL, <u>Circuit Judge</u>, concurring.

I agree with the majority that the District Court acted prematurely when it dismissed plaintiffs' First and Fourth Amendment claims at the pleading stage, and, accordingly, concur in the judgment. I write separately to express my disagreement with the majority's reasoning regarding two substantive aspects of those claims: whether we can conclude, based on this record, that 18 U.S.C. §§ 2257 and 2257A advance a substantial government interest, as required to satisfy intermediate scrutiny under the First Amendment, and whether the administrative-search exception to the warrant requirement can apply to plaintiffs' Fourth Amendment claims.

## I.

The majority correctly points out that the first step of the First Amendment intermediate-scrutiny analysis asks whether the challenged regulations advance a "substantial" governmental interest. Maj. Op. 27. While I agree, as the plaintiffs do, that the government's interest in protecting children and preventing child pornography is substantial, I cannot agree with the majority's conclusion that the government has "adequately demonstrated" at this stage of the litigation that sections 2257 and 2257A *advance* that interest. *See* Maj. Op. 29.

The Supreme Court has found this prong of the intermediate-scrutiny test satisfied where record evidence establishes that the challenged regulation serves the government's interests "in a direct and effective way." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 213 (1997)

1

("*Turner II*") (internal quotation marks omitted); *see also Ward v. Rock Against Racism*, 491 U.S. 781, 800 (1989). In my view, no evidence in the record here — which, given the case's procedural posture, is extremely sparse — establishes a "direct and effective" connection between the government's interest in preventing child pornography and the extensive and burdensome recordkeeping, labeling, and inspection requirements imposed by sections 2257 and 2257A.

Like the District Court, the majority is persuaded that the recommendation in the 1986 Report of the Attorney General's Commission on Pornography (the "Pornography Report") that Congress should enact section 2257, based on the Commission's findings that a market for child pornography continued despite previous legislative efforts to stop it and that producers of sexually explicit images often use young-looking performers, satisfies the government's burden as to this aspect of the test. *See* Maj. Op. 28. I am not so persuaded. Neither the District Court nor the majority points to anything — in the Pornography Report, the legislative history, or elsewhere — that asserts that, or explains how, these statutes provide an *effective* response to the problems the Pornography Report and Congress diagnosed.[1] Moreover, although section 2257 has been on the

---

[1] My own assessment is that the evidence and reasoning set forth in the Pornography Report regarding the recordkeeping requirements are quite thin. The Report finds in some detail that the type of child pornography that persisted after federal and state bans were enacted was distinct from the adult-entertainment industry, mostly non-commercial in nature, and involved people who were unlikely to be deterred by criminal sanctions. *See, e.g.*, Pornography Report 406 ("[T]he

2

books for almost 25 years, the record contains no evidence as to producers' or the government's experience under the statute, and, therefore, no means of assessing whether the requirements actually have had any deterrent or preventive effect.[2]

---

industry of child pornography is largely distinct from any aspect of the industry of producing and making available sexually explicit materials involving adults."); *id.* at 410 ("The greatest bulk of child pornography is produced by child abusers themselves in largely 'cottage industry' fashion, and thus child pornography must be considered as substantially inseparable from the problem of sexual abuse of children."); *id.* at 610 ("Wholly commercial operations appear to be extremely unusual . . . ."); *id.* ("However strong the criminal law, sexual exploitation of children is likely to remain an irresistible temptation for some."). The recommendation that Congress enact a recordkeeping statute, by contrast, grew out of an observation that commercial pornographers use models that look "as young as possible," *id.* at 855, and an assertion that "[t]he growth of pseudo child pornography has made it increasingly difficult for law enforcement officers to ascertain whether an individual in a film or other visual depiction is a minor," *id.* at 618. The Report does not cite any *evidence* of the use of performers who are actually underaged or the asserted law-enforcement difficulties.

[2] Some relevant questions in this regard include: Do producers of sexually explicit materials actually keep the required records? Have they ceased using underage subjects? How does the Department of Justice enforce the statutes or regulations? How many people have been prosecuted under sections 2257 and 2257A? The Pornography Report's

In the absence of such evidence, it is easy to think of reasons the statutes might *not* accomplish their desired result. For example, given the substantial federal and state criminal penalties for creating and distributing child pornography, *see generally* 18 U.S.C. §§ 2251-2254, 2256; Pornography Report 602-08 (summarizing federal and state child pornography laws), and the Pornography Report's finding that "[s]exual exploitation of children has retreated to the shadows," *id.* at 609-10, it is hard to fathom that the statutes' recordkeeping requirements would make anyone who was already inclined to engage in such activities change his behavior. An unscrupulous producer who seeks to distribute images using underaged (as opposed to merely young-looking) performers could falsify his records, and a producer who operates underground is not likely to follow the recordkeeping requirements at all. Similarly, a child determined to pass herself off as an adult could easily provide false identification to the producer.

I am mindful, of course, that we owe deference to Congress's predictive judgments as to whether a statute will materially alleviate the substantial harm it is designed to address. *Turner II*, 520 U.S. at 195. But we retain an "obligation . . . 'to assure that, in formulating its judgments, Congress has drawn reasonable inferences based on substantial evidence.'" *Id.* (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 666 (1994) ("*Turner I*")). In this case, the Pornography Report's *ipse dixit* forms the only link

---

discussion of enforcement of the federal child pornography laws provides an example of the type of data the government might supply to answer these questions. *See* Pornography Report 415-16.

4

between the statute and the asserted harms. There has been no showing that Congress made *any* predictive judgment about the statutes' likely effects, much less a determination that any such judgments were "reasonable" or "based on substantial evidence."

For these reasons, I would have asked the District Court to explore this issue more fully on remand rather than affirming the District Court's determination that the government established that sections 2257 and 2257A advance its substantial interest in preventing child pornography at the motion to dismiss stage.

## II.

The majority remands plaintiffs' Fourth Amendment claims for further development of the record concerning whether the searches alleged in this case constitute common-law trespass under *United States v. Jones*, 132 S. Ct. 945 (2012), and whether the administrative-search exception applies. Maj. Op. 43-47. I agree that the record does not provide enough information for us to determine the impact of *Jones*, but I disagree with the majority as to the need for further consideration of the administrative-search exception. In my view, no set of facts could justify the application of that exception to a warrantless inspection conducted under section 2257 or 2257A.

As in all Fourth Amendment cases, we begin with the general requirement that "Fourth Amendment protections require law enforcement officers to procure and execute a warrant before conducting a search." *Showers v. Spangler*, 182 F.3d 165, 172 (3d Cir. 1999); *see also Marshall v.*

5

*Barlow's, Inc.*, 436 U.S. 307, 323-24 (1978) ("[T]he Warrant Clause applies to inspections for compliance with regulatory statutes."). The administrative-search doctrine is one of "a few well recognized exceptions" to the warrant requirement, but its scope "is extremely limited." *Showers*, 182 F.3d at 172.

As a threshold matter, the statute and regulations must target businesses within a "pervasively regulated" industry to qualify for the exception. *See Barlow's*, 436 U.S. at 313. Whether a particular industry satisfies that test depends on "'the pervasiveness and regularity of the federal regulation,'" the "effect of such regulation upon an owner's expectation of privacy," and "'the duration of a particular regulatory scheme.'" *New York v. Burger*, 482 U.S. 691, 701 (1987). Assuming the statute and regulations apply to a pervasively regulated industry, the warrantless inspections they authorize must satisfy three requirements to qualify as "reasonable" under the Fourth Amendment: (1) "there must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made"; (2) "the warrantless inspections must be 'necessary to further [the] regulatory scheme'"; and (3) "'the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant.'" *Id.* at 702-03 (alterations in original).

At least two aspects of that analysis are problematic in this case. First, sections 2257 and 2257A do not target a "pervasively regulated" industry. Indeed, the statutes and their associated regulations are not specifically directed at any industry at all — as the majority properly concludes, they

6

govern purely private conduct and sexually explicit images that are traded clandestinely and over the Internet, as well as commercially produced pornography. Maj. Op. 34-37. But even if we were to ignore that fact and assume, contrary to their plain language, that sections 2257 and 2257A *do* specifically target the adult-entertainment industry, I do not see how we could conclude that industry is "pervasively regulated" as the term has been applied.

The District Court relied on the "steadily strengthening web" of statutes enacted over the last thirty years to "protect[] children from sexual exploitation" to conclude that the adult-entertainment industry is "pervasively regulated." *Free Speech Coal., Inc. v. Holder*, 729 F. Supp. 2d 691, 753 (E.D. Pa. 2010). But the statutes to which it refers are general criminal prohibitions on the creation and distribution of child pornography; they are not specific regulations governing the way that commercial, adult pornographers conduct their business. *Cf. Frey v. Panza*, 621 F.2d 596, 598 (3d Cir. 1980) (*per curiam*) (affirming application of administrative-search exception to warrantless inspections of houses under construction in part because the municipal building code under which the inspections were conducted "is directed specifically and exclusively at that one industry"). Moreover, as general, criminal statutes, they do not imply any diminution in an adult-entertainment producer's expectations of privacy. At the very least, the government has not shown, and it seems to me that it would be difficult for it to show, that the adult-entertainment industry is governed by the type of specific, extensive, and intrusive safety or health regulations that exist in other industries — liquor distribution, gun sales, stone quarrying and mining, automobile junkyards, veterinary drugs, transportation of hazardous materials — that

7

courts have deemed pervasively regulated for purposes of the administrative-search exception. *See United States v. 4,432 Mastercases of Cigarettes*, 448 F.3d 1168, 1176 (9th Cir. 2006) (listing "closely regulated" industries subject to administrative-search exception).

Second, the warrantless inspection regime created by sections 2257 and 2257A is not *necessary* to further the statutes' purpose. This is not a case where the government must conduct random, unannounced inspections of a business premises to ensure health and safety (as, for example, in the case of mine inspections, *see Donovan v. Dewey*, 452 U.S. 594, 603 (1981) (noting the "notorious history of serious accidents and unhealthful working conditions" in the mining industry)).[3] In fact, such inspections are not even needed to ensure compliance with the statutes. The District Court reasoned that a warrantless inspection program "encourages producers to follow the age-verification procedures regularly and in advance of the production of the depictions, and deters the possibility of fabrication or after-the-fact compilation of such information." *Free Speech Coalition*, 729 F. Supp. 2d at 754. But the amount and nature of the information the statutes and regulations require producers to record (performers' names, dates of birth, and aliases; copies of the

---

[3] The District Court finessed this issue by tying the inspections to the prevention of the sexual exploitation of children, *see Free Speech Coalition*, 729 F. Supp. 2d at 754, but that link is attenuated at best. The inspections do nothing to ensure compliance with the criminal laws' substantive prohibitions on creating or distributing child pornography; they only test compliance with the recordkeeping requirements of sections 2257 and 2257A.

performers' identification; a copy of the depiction; and the date of the original production of the depiction, *see* 18 U.S.C. §§ 2257(b), 2257A(b); 28 C.F.R. § 75.2(a)) and their complicated indexing requirements (records must be organized alphabetically by performer's name and indexed or cross referenced by the performers' aliases and the title of the production, *see* 28 C.F.R. § 75.2(a)(3)) make it exceedingly unlikely that producers could fabricate and compile such records after the fact on short notice, as would be required to comply with a subpoena or warrant.

More fundamentally, inspections of the required records could be conducted using warrants with no greater difficulty, and with no different results, than without. Warrants could issue on cause to believe that the producer is using child subjects in violation of the law based on appearance, as is always the case, or as part of "an administrative plan containing specific neutral criteria." *Barlow's*, 436 U.S. at 323; *see also Martin v. Int'l Matex Tank Terminals—Bayonne*, 928 F.2d 614, 622 (3d Cir. 1991) (explaining that probable cause for an administrative warrant may arise out of either "specific evidence of a violation" or "an administrative plan containing specific neutral criteria"). Tellingly, neither the government nor the District Court has explained why the government's goal of ensuring compliance and deterring the fabrication of records would not be served by warrants issued on short notice as part of a regular, administrative enforcement scheme.

For these reasons, I cannot accept the District Court's loose interpretation of the administrative-search exception's "necessity" requirement or believe that the warrant requirement can so easily be brushed aside. Requiring the

9

government to establish probable cause for a search, whether based on suspected violations or as part of an overall administrative inspection plan, is no more than the Fourth Amendment requires. Doing away with warrants in this instance creates a slippery slope whereby the government is permitted to test compliance with a law without the need for probable cause: if the simple goal of ensuring compliance with recordkeeping requirements and deterring fabrication of those records is enough to justify warrantless inspections of businesses and homes in this case, I see no legal barrier to also permitting federal authorities to enter businesses and homes without a warrant to inspect tax records and supporting documentation. As the absurdity of this example illustrates, the government's justification for the administrative-search exception does not meet the criteria for the narrow exception the Supreme Court, and we, have carved out in our jurisprudence.

As noted above, I concur in the judgment because I agree that the District Court should consider in the first instance how *Jones* impacts plaintiffs' Fourth Amendment claims. But I would conclude as a matter of law that the administrative-search exception to the Fourth Amendment's warrant requirement does not justify the warrantless inspections authorized under sections 2257 and 2257A.

10